[Nos. B169427, B172347. Second Dist., Div. Four. Apr. 12, 2007.]

GEORGE FRANK et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

COUNSEL

Law Office of Patricia Bellasalma, Patricia Bellasalma; O'Donnell & Kramer, J. L. O'Donnell, Jr.; Kramer & Jacob, Jennifer Kramer; Benedon & Serlin, Gerald M. Serlin and Douglas G. Benedon for Plaintiffs and Appellants.

Lackie & Dammeier and Dieter C. Dammeier for Peace Officers' Research Association of California, Legal Defense Fund and Los Angeles County Police Officers Association as Amici Curiae on behalf of Plaintiffs and Appellants.

Reich, Adell, Crost & Cvitan and Laurence S. Zakson for POPA, Inc., as Amicus Curiae on behalf of Plaintiffs and Appellants.

Isabelle Gunning for The Feminist Majority Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Shelly M. Mandell for National Organization for Women, Los Angeles, as Amicus Curiae on behalf of Plaintiffs and Appellants.

Jones Day, Elwood Lui, Scott D. Bertzyk, Jeffrey B. Kirzner; Gutierrez, Preciado & House and Calvin House for Defendants and Appellants.

## OPINION

**EPSTEIN, P. J.**—This is a race discrimination class action brought by a class of minority officers of the Los Angeles County Police against the County of Los Angeles, the Los Angeles County Sheriff's Department, and the Los Angeles County Department of Health Services (collectively County). The County appeals from a judgment finding it liable for backpay and other relief to all County police officers, including nonminority officers, who were employed when the class was certified, with the exception of supervisory officers and trainees. We conclude that the jury's liability verdict on the theories of disparate impact and disparate treatment racial discrimination must be reversed. Plaintiffs failed to establish a basis for a disparate impact claim as a matter of law, and the jury's verdict on disparate treatment is not supported by the evidence. In light of these conclusions, with a single exception which we shall note, we do not reach other issues raised by the County in its appeal, or the arguments raised by plaintiffs in their cross-appeal.

In summary, plaintiffs established that some 70 percent of officers in the County police classification are minority members and 30 percent are Caucasian, while in the sheriff's department, where officers are better paid, the percentages are reversed. That differentiation, by itself, does not establish racial discrimination, and plaintiffs failed to present evidence that the pay disparity is the product of racial discrimination.

## FACTUAL AND PROCEDURAL SUMMARY

The duties and responsibilities, as well as the organization and command structure, of the class have evolved over the past 80 years. The County had employed watchmen and then security guards to protect facilities, employees, and the public long before the Los Angeles County Safety Police was created as a specialized police department in 1970. "As of 1972, County safety police officers, who were then called security guards, were not given peace officer status under [Penal Code] section 836, and were considered peace officers only as to offenses committed with respect to persons or property which the officer had an official duty to protect. (Former [Pen. Code,] § 830.4; Stats. 1971, ch. 637, § 1, p. 1255.) This limitation remained when section 830.4

was substantially revised in 1977. (Stats. 1977, ch. 1073, § 1, p. 3266.) However, in a 1980 revision, the authority of County security officers (as well as others) was expanded to specifically include the power to effect arrests pursuant to section 836. (Stats. 1980, ch. 1340, § 12, p. 4724.) The language of the 1980 revision of section 830.4 parallels present section 830.31." (*Inouye v. County of Los Angeles* (1994) 30 Cal.App.4th 278, 284 [35 Cal.Rptr.2d 367], fn. omitted.)

Penal Code section 830.31 currently provides in pertinent part: "The following persons are peace officers whose authority extends to any place in the state for the purpose of performing their primary duty or when making an arrest pursuant to Section 836 as to any public offense with respect to which there is immediate danger to person or property, or of the escape of the perpetrator of that offense, or pursuant to Section 8597 or 8598 of the Government Code. These peace officers may carry firearms only if authorized, and under the terms and conditions specified, by their employing agency. [¶] (a) A police officer of the County of Los Angeles, if the primary duty of the officer is the enforcement of the law in or about properties owned, operated, or administered by his or her employing agency or when performing necessary duties with respect to patrons, employees, and properties of his or her employing agency."

The County police and its predecessor agencies underwent a number of administrative reorganizations between 1992 and 1998. In 1993, they were consolidated from five departments into two, and parks and recreation officers were placed in a different division. The board of supervisors ordered a study of the feasibility and cost effectiveness of consolidating the safety police into the Los Angeles Sheriff's Department (LASD). In 1994, the LASD was given a management contract over the department of health services safety police. The County was studying consolidation of all safety police programs into one department. Consolidation with LASD was rejected in 1995 and 1996. In 1998, the County established the office of county security in which all safety police were consolidated. The officers are now titled County police officers.

Deputies with LASD are classified as generalized law enforcement officers under Penal Code sections 830 and 830.1. The County Employees Retirement Law of 1937 (Gov. Code, § 31450 et seq.) provides safety member retirement benefits to eligible employees enumerated by statute. Government Code section 31470.2 enumerates the classes of peace officers eligible for safety retirement benefits, which are more generous than those for persons not eligible under that statute. Deputy sheriffs are included, but County police are not.

The County police and LASD deputy sheriffs are separately classified under the County civil service rules. Plaintiffs' expert, Dr. James Ginger,

testified that hiring requirements for County police and LASD, while not identical, are functionally equivalent. Both require a high school diploma or equivalent; a class C driver's license; and height and weight proportionality. LASD has a hearing and vision requirement while the County police does not. The County police requires either POST[1] certification or former experience as a law enforcement officer, while LASD does not.

The parties contest whether the duties of the County police and the LASD are functionally equivalent. Deputy sheriffs, but not County police officers, generally must work in the County jails for up to six years before moving to other assignments. During that initial period they transport and supervise inmates. County police have no responsibilities with respect to jail prisoners. According to Bayan Lewis, chief of the County police at the time of trial, County police are not part of the general 911 emergency telephone system, except there is a cell phone system in six county parks which rings directly to the County police communications center. Separate unions represent the County police officers and LASD deputies in collective bargaining.

The class action in this case was filed in October 1998, alleging causes of action for violations of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940 et seq.) and federal law, including title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). Plaintiffs sought backpay, front pay, equal pay, pension and workers' compensation benefits equal to those received by LASD employees, and equal promotional and assignment opportunities. They also sought extensive injunctive relief.

The court certified the class in July 2000, but only with respect to plaintiffs' claims of systemic racial discrimination: "Plaintiffs have presented sufficient evidence to raise an inference that there is an ascertainable class of safety police officers who have allegedly been denied the same terms and conditions accorded to sheriff's deputies because of their race. The parties have stipulated that a majority of safety police officers are minorities, and that safety police officers do not share the same terms and conditions of employment accorded to sheriff's deputies." The trial court further restricted the class to those who satisfied the typicality and commonality requirements, again, only as to claims of systemic racial discrimination.

The resulting class was defined as: "The 'Los Angeles County Safety Police Officer Class': includes all past, present, and future sworn Los Angeles County Safety Police Officers, in Health Services, Park Services, and Facilities Bureaus employed between June 1995 and the present, *who were denied*

---

[1] The acronym is for Commission on Peace Officer Standards and Training, a state agency which certifies both law enforcement agencies and individual officers as to training. (See Pen. Code, § 13500 et seq.)

*equal employment opportunity in equal pay, pension benefits, and workers compensation benefits by discrimination based on race, ethnicity or violation of equal protection.*" (Italics added.) The only causes of action certified with respect to the class action are the state law claims under FEHA in the first cause of action (racial discrimination), the sixth cause of action for violation of California Constitution, article I, section 7, the seventh cause of action under FEHA (failure to prevent discrimination), and the 13th cause of action for injunctive and declaratory relief.[2] The period of liability at issue was resolved by stipulation of the parties to be the period between June 1995 and "the present." (We understand "the present" to mean the date of the order, July 20, 2000.)

Trial was bifurcated into a liability phase, to be tried to a jury, and a remedies phase, tried by the trial court judge. After 14 days of trial, the jury returned the following special verdicts in favor of plaintiffs: "Question 1. Did Plaintiffs prove by a preponderance of the evidence all of the facts necessary to establish that their race was a motivating factor in the establishment of their salary and benefits?" Answer: "Yes." "Question 2: Did Plaintiffs prove by a preponderance of the evidence all of the facts necessary to establish that Defendant's decisions concerning their salary and benefits caused then [*sic*] injury, damage, loss or harm?" Answer: "Yes." "Question 3: Did Plaintiffs prove by a preponderance of the evidence all of the facts necessary to establish that Defendant's employment practices caused a significant disproportionate adverse impact on the class members that Plaintiffs represent, and other members of their protected group?" Answer: "Yes." "Question 4: Did Plaintiffs prove by a preponderance of the evidence all of the facts necessary to establish that Defendant's employment practices caused the class members that Plaintiffs represent injury, damage, loss or harm?" Answer: "Yes."

The trial court made a number of findings following the bench trial on the issues of damages and remedies. It found that eligible class members, including nonminority class members, were entitled to backpay commencing June 1, 1995, and "that the amount of the back pay would be measured by the difference between the compensation received by these class members and that provided to similarly situated persons holding comparable positions in the Sheriff's Department." The court declined to award front pay. It found

---

[2] The trial court noted that this issue was resolved by stipulation of the parties. On July 13, 2000, the parties filed a stipulation striking all federal causes of action as to both the class and individual plaintiffs; all allegations of retaliation and harassment with respect to the class (third, fourth seventh, eighth, ninth, 10th & 12th causes of action); class claims of failure to prevent unlawful discrimination "as it pertains to retaliation and harassment contained in the Seventh Cause of Action." The parties agreed that failure to prevent discrimination is alleged only in the seventh cause of action.

that eligible class members were entitled to "prospective relief ordering the County to refrain from unlawful discrimination in their future salary and benefits."

On the same day, the trial court denied relief to class members above the rank of County police lieutenant on the ground that plaintiffs failed to meet their burden of proof that these class members were similarly situated to persons holding comparable positions in the LASD. The court also denied plaintiffs' request for reclassification: "[T]he Court found that plaintiffs were not entitled to any relief rewriting or revamping the County's Civil Service classifications or reclassifying plaintiffs under a judicially revamped Civil Service system, as this relief was not requested in plaintiffs' complaint and was not supported by the jury's findings or by law. The Court subsequently acknowledged that civil service classifications can only be challenged through a mandamus proceeding involving the Civil Service Commission, which was not a party to this case." The trial court also found plaintiffs were not entitled to additional workers' compensation benefits under Labor Code section 4850 because those statutory benefits are subject to the exclusive jurisdiction of the Workers' Compensations Appeals Board in accordance with the Workers' Compensation Act.

Protracted litigation ensued over the form of the judgment. On February 18, 2003, the trial court sustained the County's objections to the award of relief concerning pension benefits. In April 2003, the court sustained the County's further objections to the form of the judgment submitted by plaintiffs, finding, among other things, that "(i) the judgment shall not include purported factual findings by the jury that are not expressly stated in the special verdict form returned by the jury; (ii) the judgment shall not include relief foreclosed by prior rulings of the Court; (iii) the judgment shall not include relief to persons outside of the class established by the July 20, 2000 Class Certification Order and the Court expressly found that the following persons are not members of the class: all County Police trainees, all persons hired as County Police officers after the date of class certification and all persons who may be hired as County Police officers in the future; and (iv) the judgment shall not include relief with respect to claims that plaintiffs previously have stipulated are not before the Court, including injunctive relief for potential retaliation or harassment against class members. The Court found that plaintiffs previously stipulated that retaliation and harassment claims were not part of the case and the existing statutory scheme provides an adequate remedy for such claims, should they ever arise."

Judgment was entered on June 6, 2003. It reflected the special verdicts and the findings by the trial court. The trial court awarded backpay to class members according to a schedule attached to the judgment. It also ordered the

County "to eliminate unlawful discrimination resulting in lower pay and benefits to eligible class members who continue to be employed after July 1, 2002."

Both plaintiffs and the County moved for new trial. Plaintiffs sought to vacate the judgment on remedies and damages only. The County moved to set aside and vacate the judgment and for judgment notwithstanding the verdict. At the end of July 2003, the trial court denied all posttrial motions. The County appealed from the portion of the judgment reflecting the special verdict and resulting judgment finding it liable; that portion of the judgment finding class members eligible for backpay; and from orders denying its motion for judgment not withstanding the verdict and the motion to partially vacate the judgment. Plaintiffs appealed from the judgment and all interim orders and rulings and from the trial court's order denying their motion to vacate the judgment.

The parties then litigated fees and costs. The trial court granted the County's motion to tax costs, and awarded $60,843.05 in costs to plaintiffs. Plaintiffs' motion for attorney fees was granted in part. A total amount of $38,011,066 was awarded, of which the County was to pay $4,677,513 and the remainder was to be paid from the individual class plaintiffs' common fund damage award. Postjudgment interest on the judgment, including fees and costs was ordered. The County appealed from the order granting fees, costs, and postjudgment interest. Plaintiffs also appealed from the order on fees, costs, and interest. We ordered the appeals consolidated.

## DISCUSSION

### I

### *The Record on Appeal*

Plaintiffs place heavy reliance in their substantial evidence argument on exhibits which were not admitted during the liability phase of the trial, which culminated in the special verdicts in favor of plaintiffs on racial discrimination. In the course of our review of the record on appeal, we learned that the cited exhibits, although referred to by counsel for both sides in their briefs, had not been delivered to this court. We asked that all trial exhibits cited in the briefs be lodged with this court. Counsel for both sides agreed that the original trial exhibits could not be located. Counsel for the County, who had designated exhibits on appeal pursuant to former California Rules of Court, rule 18, lodged two binders of exhibits. Counsel for plaintiffs, who had not designated exhibits on appeal pursuant to former rule 18, lodged 11 binders of exhibits. An objection to 47 of plaintiffs' exhibits was filed by counsel for

the County on the ground that these exhibits had not been admitted during the liability phase of the trial tried to the jury. In reply, plaintiffs acknowledged that these exhibits were only "admitted" later, during briefing on motions in the trial court in 2003, following the conclusion of the first two phases of the trial, and therefore are relevant only to their cross-appeal concerning those motions and resulting orders and judgment.

At oral argument, counsel for plaintiffs conceded that reliance on exhibits not admitted during the liability phase of trial was improper. It is axiomatic that in reviewing the liability aspect of a judgment based on a jury verdict, we may not review exhibits identified, but not admitted at trial. (See *USLIFE Savings & Loan Assn. v. National Surety Corp.* (1981) 115 Cal.App.3d 336, 343 [171 Cal.Rptr. 393] [facts, events, documents or other matters urged by party not admitted into evidence cannot be included in the record on appeal and are outside scope of review].) In *Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278 [130 Cal.Rptr.2d 436], Western's brief relied on new trial motion exhibits. The reviewing court stated that Western "asserts these exhibits should be factored in with the trial evidence and reviewed de novo. Western goes so far as to assert: '[I]t would be nearly impossible to decide this case without' considering these exhibits 'and we urge the reader to [consult them] before even commencing to analyze the briefs.' " (*Western Aggregates, Inc. v. County of Yuba, supra,* 101 Cal.App.4th at p. 291.) The Court of Appeal declined to look at the exhibits for several reasons, including Western's failure to bring a new trial motion on the ground of newly discovered evidence and its failure to argue that a new trial should have been granted. The court observed: "[The exhibits'] foundation had not been tested in the trial court. It would be improper to consider them on appeal." (*Western, supra,* at p. 292; see also *Hotels Nevada v. L.A. Pacific Center, Inc.* (2006) 144 Cal.App.4th 754, 763 [50 Cal.Rptr.3d 700] [judicial notice of matters submitted in connection with different proceedings which occurred months after ruling challenged on appeal denied on ground that appellate review is confined to matters part of the record at the time the judgment was entered].)

We decline to consider, for purposes of the liability phase verdict, exhibits lodged by plaintiffs that were not admitted into evidence during that phase of the trial. In the following discussion, we identify the exhibits, relied upon by plaintiffs in their briefing, which are outside the permissible record on appeal as to the liability phase verdicts.

## II

### *Standard of Review*

The County challenges the sufficiency of the evidence to support the special verdicts finding it liable for racial discrimination against plaintiffs. "A plaintiff in a racial discrimination action has the burden of proving . . . that the plaintiff's race was a substantial factor in the adverse employment decision. (See *Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1756 [52 Cal.Rptr.2d 620].) Our required standard of review is simply to determine whether the jury had before it substantial evidence from which it reasonably could conclude the challenged employment actions were motivated in substantial part by reasons of race. [Citations.]" (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 375 [33 Cal.Rptr.3d 644].)

In *McRae v. Department of Corrections and Rehabilitation* (2006) 142 Cal.App.4th 377 [48 Cal.Rptr.3d 313] (*McRae*), the court further explicated this standard. It recognized that actions for unlawful discrimination "are inherently fact-driven" and that "it is the jury, and not the appellate court, that is charged with the obligation of determining the facts." (*Id.* at p. 389.) The court applied the established substantial evidence standard: " 'In determining whether a judgment is supported by substantial evidence, we may not confine our consideration to isolated bits of evidence, but must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court. [Citation.] We may not substitute our view of the correct findings for those of the trial court [or jury]; rather, we must accept any reasonable interpretation of the evidence which supports the [factfinder's] decision.' " (*McRae, supra,* at p. 389, quoting *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203–1204 [52 Cal.Rptr.2d 518].)

*McRae* emphasized that " 'substantial' " evidence is not synonymous with " 'any' " evidence. (*McRae, supra,* 142 Cal.App.4th at p. 389, quoting *Beck Development Co. v. Southern Pacific Transportation Co., supra,* 44 Cal.App.4th at pp. 1203–1204.) It applied several guidelines to determine whether inferences supporting a judgment are reasonable conclusions from the evidence. (*McRae,* at p. 399.) An inference " 'cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork.' " (*McRae, supra,* 142 Cal.App.4th at p. 389, quoting *Beck Development Co. v. Southern Pacific Transportation Co., supra,* 44 Cal.App.4th at pp. 1203–1204.) " '[A]n inference cannot stand if it is unreasonable when viewed in light of the whole record.' " (*Ibid.,* quoting *Beck Development Co. v.*

*Southern Pacific Transportation Co., supra*, 44 Cal.App.4th at pp. 1203–1204.) Further, it applied an established exception to appellate deference to the trier of fact's inferences: " '[T]he trier of the facts may not indulge in the inference when that inference is rebutted by clear, positive and uncontradicted evidence of such a nature that it is not subject to doubt in the minds of reasonable men.' " (*Ibid.*, quoting *Beck Development Co. v. Southern Pacific Transportation Co., supra*, 44 Cal.App.4th at pp. 1203–1204.)

## III

### *Disparate Impact*

Plaintiffs presented two theories of racial discrimination: disparate impact and disparate treatment. Their disparate impact theory is that the "facially neutral employment practice of paying County Police less than [LASD deputies] had a disproportionately adverse impact on the minority officers who make up the vast majority of the County Police."

"To prevail on a theory of disparate impact, the employee must show that regardless of motive, a facially neutral employer practice or policy, bearing no manifest relationship to job requirements, in fact had a disproportionate adverse effect on certain employees because of their membership in a protected group." (*Knight v. Hayward Unified School Dist.*, (2005) 132 Cal.App.4th 121, 129 [33 Cal.Rptr.3d 287], italics omitted; see also *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1171 [278 Cal.Rptr. 614, 805 P.2d 873].) "[D]isparate impact is not proved merely because all members of a disadvantaged subgroup are also members of a protected group." (*Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1326 [19 Cal.Rptr.3d 519] (*Carter*).) Proof may be offered, "usually through statistical disparities, that facially neutral employment practices adopted without a deliberately discriminatory motive nevertheless have such significant adverse effects on protected groups that they are 'in operation . . . functionally equivalent to intentional discrimination.' [Citation.]" (*Harris v. Civil Service Com.* (1998) 65 Cal.App.4th 1356, 1365 [77 Cal.Rptr.2d 366], italics omitted.) Disparate impact analysis may be applied to subjective hiring practices. (*Watson v. Fort Worth Bank & Trust* (1988) 487 U.S. 977 [101 L.Ed.2d 827, 108 S.Ct. 2777].)[3]

The County argues that plaintiffs' disparate impact claim fails as a matter of law because County police officers are not a protected group under FEHA.

---

[3] California courts look to pertinent federal precedent when applying FEHA because of the similarity between that statutory scheme and title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*).)

In response, plaintiffs admit that County police officers are not a protected group under FEHA, and that neither are deputy sheriffs. Plaintiffs argue that the fact that some County police officers are Caucasian and some are minority does not defeat their claim as a matter of law because bottom-line racial balance is not a defense.[4] The issue is whether plaintiffs' evidence that all County police officers (70 percent of whom were minority) were paid less and received fewer benefits than the LASD deputies (70 percent of whom were Caucasian) established a basis for a disparate impact claim. We conclude that it does not.

*Carter, supra,* 122 Cal.App.4th 1313 is instructive. The plaintiff in *Carter* alleged that a reorganization that demoted administrative managers had a disparate impact based on gender and age, because all but one of the administrative managers were women and about half were over age 40. The court held that as a matter of law, the plaintiff failed to present a prima facie case of discrimination. (*Id.* at p. 1326.) The court explained: "Reflecting a basic misunderstanding of the meaning of disparate impact, plaintiff lays great stock in her assertion that '*no other group of employees was adversely affected*' by the reorganization. But plaintiff proves too much. We take her assertion to mean that no woman or person over the age of 40 was adversely affected *unless* she was an administrative manager. Women were not affected as a group. Persons over 40 were not affected as a group. Rather, administrative managers were affected as a group. The evidence reveals nothing more. *And the law does not prohibit discrimination against administrative managers.*" (*Id.* at pp. 1321–1322, first & second italics in original, third italics added.) The *Carter* court reasoned: "Plaintiff's entire case proceeded on the erroneous premise that administrative managers were a 'protected group' because administrative managers were almost all women and about half were over the age of 40." (*Carter, supra,* 122 Cal.App.4th at p. 1322.) It acknowledged that the plaintiff had presented substantial evidence of disparate impact of the reorganization *on administrative managers.* The plaintiff in *Carter* committed a lapse of logic by characterizing a group of employees as " 'protected' simply because employees in that category are part of a larger protected class . . . ." (*Ibid.*)

■ The *Carter* court concluded: "[T]he mere fact that each person affected by a practice or policy is also a member of a protected group does

---

[4] The reference to "bottom-line" racial balance originated in *Connecticut v. Teal* (1982) 457 U.S. 440, 442 [73 L.Ed.2d 130, 102 S.Ct. 2525] in which the Supreme Court held: "Under [the bottom-line] theory, . . . an employer's acts of racial discrimination in promotions— effected by an examination having disparate impact—would not render the employer liable for the racial discrimination suffered by employees barred from promotion if the 'bottom-line' result of the promotional process was an appropriate racial balance. We hold that the 'bottom line' does not preclude respondent employees from establishing a prima facie case, nor does it provide petitioner employer with a defense to such a case."

not establish a disparate impact." (*Carter, supra,* 122 Cal.App.4th at p. 1324, citing *Katz v. Regents of the University of California* (9th Cir. 2000) 229 F.3d 831 (*Katz*).) It observed that the plaintiff had failed to present evidence regarding the gender or age composition of all of the defendant's employees. (*Carter, supra,* 122 Cal.App.4th at p. 1325.) "The evidence was entirely about the effect of the reorganization on the administrative managers, as though it were a group protected by law. The varnish of plaintiff's words about the law's prohibition of discrimination against women and those over 40 was used as a diversionary tactic to conceal the real complaint—an adverse employment action taken against a very limited subset of the protected group—not because of their status as members of the protected group, but because of their status as members of the limited subset. Thus, plaintiff attempted to establish disparate impact by the same false logic as did the plaintiffs in *Katz.* But the *Katz* court recognized, and so do we, that disparate impact is not proved merely because all members of a disadvantaged subgroup are also members of a protected group." (*Carter, supra,* 122 Cal.App.4th at pp. 1325–1326, citing *Katz, supra,* 229 F.3d 831.)

The court relied on *Wards Cove Packing Co. v. Atonio* (1989) 490 U.S. 642 [104 L.Ed.2d 733, 109 S.Ct. 2115] (*Wards Cove*). In that case, a class of non-White cannery workers sued for racial discrimination on the ground that the employers' hiring and promotion practices were responsible for racial stratification of the workforce and that the workers had been denied employment on the basis of race. Evidence established that the employers had two general types of jobs at their canneries: unskilled cannery jobs on the cannery lines, which were filled predominantly by non-Whites, and noncannery jobs, most of which were classified as skilled positions and filled predominantly with White workers, and virtually all of which paid more than cannery positions. (*Wards Cove, supra,* 490 U.S. at pp. 646–647.) Housing and dining facilities were segregated by job type. (*Id.* at p. 647.)

The court of appeals relied solely on the plaintiffs' statistics showing a high percentage of non-White workers in the cannery jobs and a low percentage of such workers in the noncannery positions in finding a prima facie case of disparate impact had been established. The Supreme Court reversed, finding that the court of appeals "misapprehends our precedents" as well as the purpose of title VII. (*Wards Cove, supra,* 490 U.S. at p. 650.) One analytical flaw identified by the *Wards Cove* court was "with respect to the skilled noncannery jobs at issue here, the cannery work force in no way reflected 'the pool of *qualified* job applicants' or the '*qualified* population in the labor force.' " (*Id.* at p. 651.) The Supreme Court held that measuring alleged discrimination in the selection of skilled noncannery positions "by comparing the number of nonwhites occupying these jobs to the number of nonwhites filling cannery worker positions is nonsensical. If the absence of minorities holding such skilled positions is due to a dearth of qualified

nonwhite applicants (for reasons that are not [the employers'] fault) [the employers'] selection methods or employment practices cannot be said to have a 'disparate impact' on nonwhites." (*Id.* at pp. 651–652, fn. omitted.)

The Supreme Court recognized that if the dearth of qualified non-White applicants were due to practices on the employers' part that deterred minority group members from applying for noncannery positions, the analysis would be different. (*Wards Cove, supra,* 490 U.S. at p. 651, fn. 7.) Here, although there was some evidence that County police officers transferring to the LASD were required to return to the academy for additional training, plaintiffs presented no evidence that minorities were deterred from applying for LASD positions rather than the County police.

■ The absence of evidence of barriers to prevent non-Whites from applying for the higher paid jobs was the basis for a second error the *Wards Cove* court found in the court of appeals' analysis. "Racial imbalance in one segment of an employer's work force does not, without more, establish a prima facie case of disparate impact with respect to the selection of workers for the employer's other positions, *even where workers for the different positions may have somewhat fungible skills* (as is arguably the case for cannery and unskilled noncannery workers). As long as there are no barriers or practices deterring qualified nonwhites from applying for noncannery positions, . . . if the percentage of selected applicants who are nonwhite is not significantly less than the percentage of qualified applicants who are nonwhite, the employer's selection mechanism probably does not operate with a disparate impact on minorities." (*Wards Cove, supra,* 490 U.S. at p. 653, italics added.)

The *Wards Cove* court concluded that where there is no evidence of employment practices which deter qualified applicants for the higher paid positions, "the percentage of nonwhite workers found in other positions in the employer's labor force is irrelevant to the question of a prima facie statistical case of disparate impact." (*Wards Cove, supra,* 490 U.S. at p. 653.) The Supreme Court reasoned that "isolating the cannery workers as the potential 'labor force' for unskilled noncannery positions is at once both too broad and too narrow in its focus. It is too broad because the vast majority of these cannery workers did not seek jobs in unskilled noncannery positions; there is no showing that many of them would have done so even if none of the arguably 'deterring' practices existed. Thus, the pool of cannery workers cannot be used as a surrogate for the class of qualified job applicants because it contains many persons who have not (and would not) be noncannery job applicants." (*Id.* at pp. 653–654.)

Plaintiffs cite *Liberles v. County of Cook* (7th Cir. 1983) 709 F.2d 1122 (*Liberles*) in support of their argument that the discrimination claim is not

defeated because some County police officers are minority and others are Caucasian. *Liberles* was a class action equal pay for equal work case brought by a class of African-American employees challenging the employment policies of the Cook County Department of Public Aid. The casework staff of that department determined the eligibility and amount of public assistance grants. Eighty-three percent of the lower-paid case aides and case aide trainees were African-American. Eighty-one percent of higher-paid caseworker I employees were Caucasian. Plaintiffs presented extensive evidence that case aides and trainees were assigned the same tasks as the caseworkers; the only distinction was in the compensation received by each class of employee.

During the relevant period, the caseworker I position required a four-year college degree and a successful examination. There was evidence that these hiring policies had a disparate impact because nearly three times as many Caucasians as African-Americans in Cook County had a bachelor's degree, and the examination was biased toward applicants with that credential. (*Liberles, supra,* 709 F.2d at pp. 1127–1128.) Thus in *Liberles,* there was evidence that the employer's policies *created* a deterrent to application to the higher paid positions, unlike the policies at issue in *Wards Cove.* The Seventh Circuit found no evidence that the classes of workers did not perform the same tasks. It concluded that the plaintiffs had established a prima facie case of disparate impact. (*Liberles, supra,* at pp. 1130–1131.)

In our case, plaintiffs failed to present any evidence that the County's policies and procedures constituted a similar racially discriminatory barrier which deterred plaintiffs from applying for the position of LASD deputy. The County police officers who testified did not say that County policies prevented them from applying to the LASD rather than the County police. Instead, they chose to apply to the County police for various reasons. For example, Mosell McCoy, a County police sergeant, testified that she was led to the County police because she had seen a flier and that the "reason I applied for the County Police and not the Sheriff's Department, because at that time and still today, that the County Police did more patrolling and they were more involved in the communities."

Captain Alma Cruz of the County police testified that in addition to the predecessor of the County police, she applied to LASD, and the Los Angeles and Santa Ana Police Departments. When asked why she chose the County police, Captain Cruz responded: "They called me first." Sergeant Anthony Brookins of the County police was asked why he wanted to become a County police officer. He testified that the County police officers with whom he had contact while growing up in South Central Los Angeles were there to serve the community, and that this had made a lasting impression on him.

The plaintiffs in this case, unlike those in *Liberles*, presented no evidence that County policies and procedures deterred minorities from applying to, and being hired by, the LASD. Moreover, plaintiffs presented no evidence that the hiring qualifications for the LASD discriminated against minorities, as had the policies at issue in *Liberles*.

We conclude that the jury's special verdict on the disparate impact theory must be reversed because plaintiffs failed to establish a prima facie case of racial discrimination. As in *Wards Cove, supra,* 490 U.S. 642 and *Carter, supra,* 122 Cal.App.4th 1313, there was no showing that the County's policies had a disproportionate adverse impact on the class members because they are minorities and thus members of a protected group. Instead, the evidence established that the County's policies were to pay the class members, Caucasian and minority alike, less because they were members of the County police rather than the LASD. Plaintiffs presented no evidence that the County established policies which worked as a barrier or deterrent to minority application to and hiring by the LASD.

## IV

### *Disparate Treatment*

■ Plaintiffs also alleged the County intentionally discriminated against them in the establishment of their salary and benefits, based on race. They argue, correctly, that racial animus may be proven by indirect or circumstantial evidence, and direct evidence of racial discrimination is rarely available.

### A. *Legal Principles*

■ Under a disparate treatment theory, discrimination occurs "when the employer 'treats some people less favorably than others because of their race, color, . . . or national origin.' (*Teamsters v. United States* (1977) 431 U.S. 324, 335–336, fn. 15 [52 L.Ed.2d 396, 415, 97 S.Ct. 1843].)" (*Heard v. Lockheed Missiles & Space Co., supra,* 44 Cal.App.4th at p. 1748 (*Heard*).) "[T]he plaintiff must prove the ultimate fact that the defendant engaged in intentional discrimination. [Citations.] An employer will be liable for intentional discrimination if it is shown that its employment decision was premised upon an illegitimate criterion." (*Heard, supra,* 44 Cal.App.4th at p. 1748, citing *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 805, fn. 18 [36 L.Ed.2d 668, 93 S.Ct. 1817] (*McDonnell Douglas*).)

Federal and California courts have acknowledged the difficulty of proving intentional discrimination: "Proving intentional discrimination can be difficult because '[t]here will seldom be "eyewitness" testimony as to the employer's

mental processes.' (*U. S..Postal Service Bd. of Govs.* v. *Aikens* (1983) 460 U.S. 711, 716 [75 L.Ed.2d 403, 410–411, 103 S.Ct. 1478]; see also *Dugan* v. *Pennsylvania Millers Mut. Ins. Co.* (M.D.Pa. 1994) 871 F.Supp. 785.) It is rare for a plaintiff to be able to produce direct evidence or 'smoking gun' evidence of discrimination. (*Dugan, supra*, 871 F.Supp. 785; see also *Chipollini* v. *Spencer Gifts, Inc.* (3d Cir. 1987) 814 F.2d 893, 897.)" (*Heard, supra*, 44 Cal.App.4th at p. 1748.)

█ "Consequently, the United States Supreme Court has developed rules regarding the allocation of burdens and the order in which proof is presented to resolve 'the elusive factual question of intentional discrimination.' (*Texas Dept. of Community Affairs* v. *Burdine* [(1981)] 450 U.S. 248, 255, fn. 8 [67 L.Ed.2d 207, 216, 101 S.Ct. 1089]; see also [*McDonnell Douglas*], *supra*, 411 U.S. 792.) Thus, plaintiffs may demonstrate via indirect or circumstantial evidence that they were the victims of discrimination." (*Heard, supra*, 44 Cal.App.4th at p. 1749.) "First, it is the plaintiff's burden to prove by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff proves the prima facie case, then the burden shifts to the defendant to provide some legitimate nondiscriminatory reason for its employment decision. Third, if the defendant carries this burden, then the plaintiff must have an opportunity to show by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. (*Texas Dept. of Community Affairs* v. *Burdine, supra*, 450 U.S. at pp. 252–253 [67 L.Ed.2d at pp. 214–215], citing [*McDonnell Douglas*], *supra*, 411 U.S. 792, 802–804 [36 L.Ed.2d 668, 677–679].)" (*Heard, supra*, 44 Cal.App.4th at pp. 1749–1750.)

While the burden of production shifts to the defendant under the *McDonnell Douglas* framework once a prima facie case is made, "the ultimate burden of persuading the trier of fact that the defendant engaged in intentional discrimination remains at all times with the plaintiff." (*Heard, supra*, 44 Cal.App.4th at p. 1750.) If the defendant succeeds in carrying its burden of production, "the *McDonnell Douglas* framework 'drops from the case' and the trier of fact determines the ultimate question of whether the plaintiff has shown intentional discrimination." (*Heard, supra*, at p. 1750, citing *St. Mary's Honor Center* v. *Hicks* (1993) 509 U.S. 502, 510–511 [125 L.Ed.2d 407, 113 S.Ct. 2742].)

█ The *McDonnell Douglas* court provided a model for the prima facie case of racial discrimination, which it explained was flexible because its elements will vary according to differing title VII factual situations presented. (*McDonnell Douglas, supra*, 411 U.S. at p. 802, fn. 13.) The court in *Horsford* v. *Board of Trustees of California State University, supra*, 132

Cal.App.4th 359, examined the nature of the plaintiff's burden following the California Supreme Court's decision in *Guz, supra,* 24 Cal.4th at page 367: "Thus, *Guz* . . . stands for the limited proposition that where the defendant has made a strong showing that its personnel decisions were not based on an impermissible discriminatory factor, the plaintiff cannot prevail merely by showing the personnel decisions negatively impacted a protected group." (*Horsford v. Board of Trustees of California State University, supra,* 132 Cal.App.4th at pp. 376–377.) The *Horsford* court held: "A plaintiff's burden is . . . to produce evidence that, taken as a whole, permits a rational inference that intentional discrimination was a substantial motivating factor in the employer's actions toward the plaintiff. " (*Id.* at p. 377.)

The burden of persuasion remains with the plaintiff even in the face of evidence that the employer's proffered reasons are pretextual: "The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.' [Citation.] In other words, '[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.' [Citation.]" (*Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 146–147 [147 L.Ed.2d 105, 120 S.Ct. 2097], italics omitted.) Nevertheless, evidence that the employer's proffered reasons are pretextual is significant: "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." (*Id.* at p. 148.)

■ ■ "It is insufficient for a plaintiff alleging discrimination under the disparate treatment theory to show the employer was merely aware of the adverse consequences the policy would have on a protected group." (*Am. Fed. of S., C., & Mun. Emp. v. State of Wash.* (9th Cir. 1985) 770 F.2d 1401, 1405.) The plaintiff must show the challenged policy was chosen "because of its effect on members of a protected class." (*Ibid.*; *Forsberg v. Pacific Northwest Bell Telephone Co.* (9th Cir. 1988) 840 F.2d 1409, 1418.)

## B. *Plaintiffs' Evidence*

In conformity with the substantial evidence standard of review, we have reviewed the entire reporter's transcript on appeal and the exhibits which are properly part of the record on appeal (see. Discussion pt. I, *ante*). We find no evidence from which the jury could reasonably infer that County police officers were paid less than the LASD deputies because of intentional racial discrimination.

Dr. Michael Ward, an economist, testified for plaintiffs about the extensive statistical analysis he performed regarding the pay of County police and LASD officers. Plaintiffs rely on his conclusion that plaintiffs are paid much less than the LASD and that the disparity is associated with race. Dr. Ward testified that based on five tests he ran comparing pay to minority officers within the County police and the LASD: "[I]f you group these officers together, safety officers and county officers, you would conclude, based on the statistics and controlling for experience measures, that minority officers, as a group, are paid less than white officers, and it's highly statistically significant." On cross-examination, Dr. Ward was asked: "With respect to the analysis that you presented on the racial disparity, that is explainable by the fact that the sheriff's department pays more than the County Police, correct?" He answered: "Most of the difference." He was asked whether he thought the wage disparity between safety police officers and deputy sheriffs is based on race. He answered: "I have no opinion about that. My statistical opinion is that it's associated with race."

Counsel for the County asked Dr. Ward whether it was "fair to say that an underlying assumption of the analysis that you did along racial lines is that deputy sheriffs and County Police officers are comparable?" Dr. Ward answered "yes" and said that he had not performed his own analysis of comparability of County police officers to deputy sheriffs. He said he believed that Dr. James Ginger, another expert for plaintiffs, had testified to comparability.

Plaintiffs presented expert testimony by Dr. Ginger comparing the compensation of County police officers with that of LASD deputy sheriffs. He concluded that their work was functionally equivalent. Dr. Ginger reviewed documents, administered field depositions, and collected POST survey data to measure the comparability between the County police and LASD using eight factors. He and his assistants only gave the survey to officers who were assigned to patrol duties. He explained: "So we didn't get any administrative people in the survey responses from L.A. County Police, we didn't get any support services folks. These were all folks who engaged in—within the last year radio patrol duties." Dr. Ginger chose 108 officers from the two departments for the field depositions. The officers were chosen in consultation with counsel for plaintiffs, based on a review of organizational charts and deployment lists.

Dr. Ginger explained further: "So, for example, it would have skewed the data had we selected only radio and patrol officers from County Police and then selected all desk jobs from the Sheriff's Department. And we tried to balance that out. [¶] Having said that, it's important to understand that there is a—there is a difference between the two agencies, these are not uniquely

similar agencies. The County Police have many fewer—in terms both of proportion and numbers, desk jobs, administrative jobs, job[s] that don't require officers to be out in the field responding day to day to criminal events, those sorts of things than do the County Sheriff. [¶] . . . [¶] County Sheriff have a large number and a proportionally higher number of functional positions that don't go out on the street and respond to criminal activity. The largest number of those being the custodial deputies, the custody deputies, the ones that run the county jails. While they obviously are dealing with a clientele, it's a little bit different, they're not on the street, [are] not confronting a lot of the exigent circumstances, the emergency circumstances that a street police officer might encounter. So that accounts for some of the difference that you see with the L.A. County Police scoring higher on these factors, and that difference is that the L.A. County Police for the most part are all out on the road doing law enforcement, and proportionately a smaller number of them are doing desk jobs. Custody jobs."

We are not told what percentage of either force or the combined forces the 108 officers interviewed in field depositions constitute. Dr. Ginger testified that he obtained 32 "useable" responses to his survey, but he was unable to recall how many were sent out to those assigned to patrol duty. He said that he did not do any statistical analysis to determine sample size for statistical probability. We are not told what percentage of the total officers the 32 officers represent.

On cross-examination, counsel for the County established that the field depositions asked questions about the activities of the officer over the preceding year. The following question is illustrative of this format which asked only for a yes or no answer: "During the last year have you had occasion to pursue a fleeing suspect on foot or by vehicle?" The officers were not asked the number of such incidents they experienced in each category during the preceding year. They could have done it once or 10 times.

Some of the questions were vague and led to misleading answers. For example, the transcript of one County police officer's field deposition was read into the record: "Q. During the past year have you had the occasion to respond to rapes?" "A. Yes." "Q. Could you please give me more detail?" "A. Okay. Respond to rapes, rapes that come into the hospital and we have to take the investigation, and get the information on rapes, and then assign it to the jurisdiction of which it occurred." "Q. Do you ever go to the scene of the rape?" "A. No. The jurisdiction will do that." Dr. Ginger agreed that the majority of positive responses he got to the question about responding to rapes from County police officers related to managing rape victims in the emergency room of a hospital.

A similar problem occurred with the questions about responding to homicides. A field deposition transcript was read to the jury in which a County police officer answered that he had responded to a homicide during the previous year, but then explained that his duty was to maintain the perimeter. The reporter's transcript contains no information about the number of officers in the County police and in the LASD assigned to various functions, or even the number of officers in each department during the relevant time periods. Dr. Ginger did not discuss such statistics as part of his analysis.

We conclude that Dr. Ginger's study did not adequately take into consideration the various functions performed by each department and the number of officers assigned to those functions. In addition, his field depositions gathered information about types of incidents dealt with by radio patrol officers, but failed to take into account the critical factor of the frequency with which the officers dealt with these situations. We are not told whether the number of respondents was statistically reliable. In light of these issues, we conclude that the jury could not reasonably rely on Dr. Ginger's conclusion that the duties of County police officers and LASD deputies were functionally equivalent or comparable. This evidentiary omission in plaintiffs' case undermines the rest of their experts' testimony because the other experts assumed that the duties of the officers were comparable. Since plaintiffs did not show that they are, they cannot establish their basic premise: that they performed equal work but were paid less because of racial discrimination.

Plaintiffs assert that the verdict "reflects numerous express and implied factual findings . . . on (1) the equality of work performed by Plaintiffs and Deputy Sheriffs, . . ." The jury was not asked to reach a special verdict on this issue. The special verdicts merely stated that race was a motivating factor in the establishment of plaintiffs' salary and benefits and that the County's employment practices caused a significant disproportionate adverse impact on class members. We may not infer additional jury findings. "With a special verdict, we do not imply findings on all issues in favor of the prevailing party, as with a general verdict. [Citation.]" (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 285 [73 Cal.Rptr.2d 596].)

We turn to an examination of the specific evidence cited by plaintiffs in support of their argument that the County's intent to discriminate on the basis of race was established.

C. *Plaintiff's Evidence of Racial Intent*

Plaintiffs argue that they established that race was a motivating factor in establishing their salary and benefits. We examine each category of evidence upon which they rely.

1. *Racial Composition*

First, plaintiffs point out that the County was aware that a majority of the County police officers were members of a racial minority while a majority of the LASD deputies were Caucasian. This is undisputed.

2. *Less Pay for Equal Work*

The second category of evidence asserted by plaintiffs is that the County violated its own equal pay mandate by knowingly paying County police much less for work equal to that performed by LASD deputies.

In this category, plaintiffs cite page 2778 of volume 7 of the reporter's transcript without indicating which witness's testimony they are relying upon. Page 2778 is in volume 8 rather than volume 7 of the transcript. It is the testimony of Barry Dineen, dean of the department of public safety and director of the police and fire and corrections training at Rio Hondo College. Mr. Dineen testified about his experience as a law enforcement officer for the City of Monrovia, the Army, and the LASD. He also described his involvement in the process of accreditation for Rio Hondo College. Nothing on the cited page relates to the County's awareness that County police and LASD perform equal work.

The exhibits cited by plaintiffs in support of this contention—exhibits 6, 17, 23, 24, 26, 27, 33, and 50—were not admitted during the jury trial and before the verdict, and may not be considered in determining the sufficiency of the evidence to support the jury's verdict.

3. *County's Awareness of Disparities Associated with Race*

The third category of evidence cited by plaintiffs concerns their assertion that the County was aware that the gross disparities in pay and benefits between County police officers and LASD deputies were associated with race. In support of this factor, plaintiffs cite exhibit 38, a letter dated February 18, 1992, regarding a complaint about wages being racially biased. But that exhibit was not admitted during the phase of the trial leading to the jury verdict. According to plaintiffs, it was admitted in 2003, well after the June 2002 verdict.

Plaintiffs also cite pages 2495–2505 of the reporter's transcript, from the testimony of Eva Brusa. Brusa was a human resources analyst for the County Department of Human Resources beginning in 1996. She became involved in the study of a proposed consolidation of the County police. In her testimony at the cited pages, Brusa describes what she did in looking into the LASD as

well. She looked at the LASD ranking structure, duties, and classifications. Brusa also rode along with deputy sheriffs on patrol. She also discussed her training and experience in performing job task analyses and classification studies.

We note that plaintiffs failed to cite the portions of Brusa's testimony in which she describes her investigation of the duties of the County police, which included conducting a salary survey, visiting each of the departments where they were employed, speaking to as many officers as possible in different contexts, riding along with them and spending time on their shifts. Brusa spoke with County police officers at standing posts and on patrol. She attempted to speak with the chiefs as well as officers. She also spoke with department heads and other managers in the departments where the safety police were employed.

In the passage relied upon by plaintiffs to show the County's knowledge that the pay disparity was associated with race, Brusa testified that she came to a conclusion that there were inconsistencies within the County police as to how their role was perceived. The perceptions of their role also differed within the different departments. Brusa also discussed her understanding of the difference in authority granted the County police and the LASD under the Penal Code. She understood that the authority extended in and around County buildings and property, and thus was more limited than the sheriff's. In this portion of the reporter's transcript, counsel for plaintiffs read Brusa's deposition testimony to the effect that she did not believe County police were full-time peace officers with 24-hour authority. She saw them as performing a law enforcement function.

Brusa also thought that the security guards, who were not tied to any bargaining unit, should be tied to the safety police and be part of the new consolidated organization. There were 12 individuals classified as security guards who were not in POST-certified positions. They were unarmed and did a variety of tasks not performed by the safety police.

In her salary survey outside the County, Brusa did not find any classifications entirely comparable to the County police. The San Francisco General Hospital police were the closest in similarity to the duties of the County police assigned to the Los Angeles Department of Health Services. The director of the internal services unit and the director of parks and recreation gave her information about the law enforcement powers of County police.

As a result of collecting all of this information, Brusa "understood there were many ideas floating around" and that one of these was that County police could not make anything other than the equivalent of a citizen's arrest when off duty.

We find nothing in Brusa's testimony on the cited pages of transcript which supports plaintiffs' assertion that "[t]he County was aware that the gross disparities in wages and benefits between County Police and [LASD] were associated with race." There was no mention of race, or of the disparity in the racial composition of the two forces.

### 4. *Handling of Salary Surveys*

The next category of evidence cited by plaintiffs concerns County salary surveys which, they argue, benchmarked the minority County police officers as "security guards." In addition, plaintiffs cite evidence that the County ignored salary surveys which showed "minority County Police are both significantly underpaid and full-time law enforcement officers." No evidence is cited in support of these arguments. In their statement of facts, plaintiffs summarize evidence regarding the compensation benchmarks used by the County. Some of the exhibits they cite were not admitted at the liability phase of the trial. (Exhibits 17, 24, 27, 70, 71, 138.) We have reviewed and discuss only those admitted at that phase of trial.

Plaintiffs' evidence established that County personnel involved in classification and compensation were concerned that the job descriptions for County police officers did not fully reflect the job being performed. For purposes of argument, we will assume this was so. There are two more steps in order to establish intentional race discrimination. Plaintiffs had to prove that there was a discrepancy between the job descriptions and the actual duties. And they had to establish that racial bias was the reason the County did nothing in response. As to the last step, there was no evidence at all. There is no indication in the exhibits or testimony that the salary surveys established that only the minority County police were underpaid, as plaintiffs assert. The surveys show that all County police were underpaid, whatever their race. The evidence regarding the salary surveys does not refer to the racial composition of the County police.

### 5. *Pay Disparity*

Plaintiffs assert: "Minority officers of the Sheriffs Department and the County Police were, as a class, paid about 20% less than their White officer counterparts. Moreover, the higher salaries were paid disproportionately to White officers, while the lower salaries were paid disproportionately to the minority officers."

Plaintiffs do not name the witness they rely upon to support their contention that racial animus may be shown by the disparity in pay between Caucasian and minority officers. They cite reporter's transcript volume 6,

pages 28, 30, 35, and 40. We are unable to locate the reporter's transcript passages cited. Volume 6 of the reporter's transcript on appeal begins with page 1501. Pages 28–40 of the reporter's transcript, in volume 3, is the opening statement by counsel for the County. In another volume of the transcript, Dr. Ward testified that "if you group these officers together, safety officers and county officers, you would conclude, based on the statistics and controlling for experience measures, that minority officers, as a group, are paid less than White officers, and it's highly statistically significant." On cross-examination, he conceded that "[m]ost of the difference" was explainable by the fact that the LASD pays more than the County Police.

The problem is that Dr. Ward simply lumped together officers in the two departments. He failed to recognize the difference in their duties. Dr. Ward testified that his analysis was based on Dr. Ginger's conclusion that the duties of sheriff's deputies and County police officers are comparable. As we have discussed, this conclusion was not supported by reliable statistical evidence. The evidence of pay disparity does not demonstrate the requisite racial animus.

6. *Disparagement*

Plaintiffs argue that LASD personnel disparaged County police on the basis of race. They cite exhibits 58, 59 and 132 in support of this statement. Exhibit 132 was not admitted during the liability phase of trial and may not be considered on the sufficiency of the evidence question. We have reviewed exhibits 58 and 59 in detail. These 1993 documents detail the duties of park rangers and discuss how they should be paid with respect to various levels of safety police officers under a planned consolidation. We find no disparaging comment of any kind in these documents, and no reference to race.

Plaintiffs also cite exhibit 126 as evidence that minority County police officers were "negatively compared to the predominantly Caucasian park rangers who were characterized as 'easier to integrate than [County] Police' and as a '[d]ifferent breed.' " Exhibit 126 is an undated document titled "Employee Relations Issues Regarding Transfer of Functions of Safety Police and Park Rangers."

Exhibit 126 warns that "ALADS" "may become proactive in expressed animosity regarding the transfer of functions of Safety Police and Park Rangers to this Department.[5] Both may be viewed as 2nd class officers based on their limited Peace Officer Status." Under a section titled "Bargaining Impact" it states: "Safety Police: Predict high maintenance, high risk, high potential for discipline and grievances."

---

[5] We understand the acronym to refer to the Association for Los Angeles Deputy Sheriffs.

In their brief, plaintiffs excerpt a statement from exhibit 126 as stating that park rangers were characterized as a " '[d]ifferent breed.' " The full statement does not support the overt racial implication suggested by plaintiffs: "Park Rangers: Easier to integrate than Safety Police. Different breed, more likely to be a college graduate, environmentalists, etc. Also, because of the number of employees (87), it is anticipated an easier transition." Plaintiffs do not provide a record citation for the assertion that the park rangers were pre-dominantly Caucasian. Exhibit 126 is evidence that members of the LASD opposed consolidation with the County police, and that integration with park rangers was likely to be easier because of their smaller number.

## 7. *Specific Statements*

As evidence of a discriminatory racial intent, plaintiffs argue "County Police were referred to by high ranking County officials as being 'different in character and intelligence,' as having 'cascaded down' from the trees, and being 'incompetent.' " Pages 1263 and 3072 of the reporter's transcript are cited for these statements. The first reference is to testimony of Bayan Lewis, chief of the County police at the time of trial. The first passage quoted by plaintiffs actually is found in a question by counsel for plaintiffs: "And did [Lee Taylor, a County consultant] tell you that [the County Police] were a bunch of folks that had cascaded down from positions as tree trimmers, cooks, and janitors?" Lewis answered: "He did not say they were a bunch of folks, he said there were some that were still in safety police or park rangers that had—a few that had at one point cascaded within county service, a few."

The second passage is found in the testimony of lead plaintiff, County police Captain George Frank, at page 3072 of the reporter's transcript. The word "incompetent" does not appear on that page. Instead, Captain Frank describes the problems caused by civilian administration of the safety police in the 1980's.

## 8. *Failure to Address Disparities*

Plaintiffs next cite the County's failure to address years of gross compen-sation disparities between County police and LASD associated with race as evidence that they established intentional discrimination based on race. They cite exhibits 114 and 115 in support of this statement. Neither exhibit was admitted during the liability phase of the trial and cannot be considered in our review of the liability verdict.

## 9. *Failure to Follow Procedure*

Finally, plaintiffs make the broad assertion that discriminatory racial intent is established by expert testimony that the County did not follow its own

procedures in determining classification and salary. But plaintiffs' briefing provides no citation to the record for that proposition. We are uncertain as to which expert witness plaintiffs refer. In their statement of facts, plaintiffs state that the County failed to utilize its standard personnel policies throughout the history of the County police. In that portion of their brief, plaintiffs discuss the testimony of Henri van Adelsberg, a consultant who conducts classification and compensation studies.

Van Adelsberg testified that the County did not follow its own procedure in dealing with the County police. He said he could find no testimony that "someone had gone out either in the field, interviewed County police officers, and done what we call desk or field audit, gone out on ride along, studied what they did, spent time with them in their various stations and duties. Cannot find that. Now, if you don't do that, it's going to be very difficult to do all the other stuff necessary, because you don't know a job you're dealing with. So that was never done."

In addition, van Adelsberg testified about salary surveys conducted by the County in 1997 and 1999. Each was discarded. The 1999 salary survey of other departments came back saying that the County police officer was similar to their peace officers. That survey was also received and rejected.

In summary, plaintiffs' claim of racial intent is not supported by the record. It may be that County police officers should be better compensated as a class. That abstract issue is not before us. The question is whether the pay disparity was the product of intent to discriminate based on race. We conclude that the jury could not reasonably infer such intent from the record. Without it, the special verdict on disparate treatment must be reversed.

V

*Whether Plaintiffs Are Entitled to a New Trial*

The remaining issue is whether plaintiffs are entitled to a new trial. The reversal in this case is based on insufficiency of the evidence. " 'When the plaintiff has had full and fair opportunity to present the case, and the evidence is insufficient as a matter of law to support plaintiff's cause of action, a judgment for defendant is required and no new trial is ordinarily allowed, save for newly discovered evidence. . . . Certainly, where the plaintiff's evidence is insufficient as a matter of law to support a judgment for plaintiff, a reversal with directions to enter judgment for the defendant is proper. . . . [¶] . . . [A] reversal of a judgment for the plaintiff based on insufficiency of the evidence should place the parties, at most, in the position they were in after all the evidence was in and both sides had rested.' (*McCoy v. Hearst*

*Corp.* (1991) 227 Cal.App.3d 1657, 1661 [278 Cal.Rptr. 596]; accord, *Bank of America v. Superior Court* (1990) 220 Cal.App.3d 613, 626–627 [269 Cal.Rptr. 596].) In another context, our Supreme Court explained in *Silberg v. Anderson* (1990) 50 Cal.3d 205, 214 [266 Cal.Rptr. 638, 786 P.2d 365], that '[f]or our justice system to function, it is necessary that litigants assume responsibility for the complete litigation of their cause during the proceedings.' " (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 919 [52 Cal.Rptr.3d 126].)

Plaintiffs had a full opportunity to present their evidence, which was insufficient as a matter of law. No new trial is warranted and the County is entitled to judgment in its favor. With a single exception, which we note below,[6] we do not reach other issues raised in the appeal and in the cross-appeal.

## VI

### *Conclusion*

■ The verdict on disparate impact must be reversed because plaintiffs failed to establish a prima facie case of racial discrimination; the evidence established that the County's policies had a disparate impact on all County police officers, minority and Caucasian. The verdict on disparate treatment must be reversed because there is no substantial evidence that the County's policies were racially motivated.

---

[6] The County argues that the following recital in the memorandum of understanding (MOU) negotiated by the unions representing County police and the County, is a defense to plaintiffs' claims: "The parties having jointly reviewed and considered available salary and wage information data, agree that the recommended salaries set forth herein were negotiated in good faith, and that said salaries were determined independently of race, gender, age or national origin." The County contends the trial court misinterpreted applicable law, and based on that misinterpretation, misinstructed the jury and improperly limited the use of this language to the few individual plaintiffs who were signatories to the MOU.

Whether the County's position is correct or not, it would not affect our conclusion that the judgment in favor of plaintiffs must be reversed. We note, however, that the underlying lawsuit is an action by a class of individual employees, not by the unions which entered into the MOU's with the County, and that "a union cannot waive its employees' statutory rights under title VII by entering into a [collective bargaining agreement] with an employer because of 'the paramount congressional purpose behind title VII,' and that for the same reason an employee cannot waive title VII rights by submitting a grievance to arbitration under a CBA." (*Camargo v. California Portland Cement Co.* (2001) 86 Cal.App.4th 995, 1008 [103 Cal.Rptr.2d 841] [applying to FEHA], quoting *Alexander v. Gardner-Denver Co.* (1974) 415 U.S. 36, 51–52 [39 L.Ed.2d 147, 94 S.Ct. 1011]; see *Torrez v. Consolidated Freightways Corp.* (1997) 58 Cal.App.4th 1247, 1259 [68 Cal.Rptr.2d 792].)

## DISPOSITION

The judgment is reversed and the matter is remanded with directions to enter judgment in favor of the County. The County is to have its costs on appeal.

Willhite, J., and Suzukawa, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied August 8, 2007, S152860.