[No. B225089. Second Dist., Div. Eight. Dec. 9, 2010.]

UNITED PARCEL SERVICE WAGE AND HOUR CASES.
DAVID TAYLOR, Plaintiff and Appellant, v.
UNITED PARCEL SERVICE, INC., Defendant and Respondent.

Furutani & Peters and John A. Furutani for Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker, Katherine C. Huibonhoa and Ryan C. Hess for Defendant and Respondent.

## OPINION

**GRIMES, J.**—Plaintiff and appellant David Taylor (Taylor) brought an action against his employer, defendant and respondent United Parcel Service, Inc. (UPS), seeking recovery of unpaid overtime compensation, penalties for missed meal and rest periods, and other related claims.[1] UPS successfully moved for summary judgment on the grounds Taylor was an exempt executive and administrative employee and therefore not entitled to overtime payments and the related benefits afforded nonexempt employees. Taylor appeals, contending there are material triable issues as to whether he was misclassified as exempt. Because we conclude the trial court correctly granted summary judgment, we affirm.

## DISCUSSION

1. *Standard of review.*

The standard of review of an order granting summary judgment is well established. Our review is de novo. (*Guz v. Bechtel National, Inc.* (2000) 24

---

[1] Taylor is a former class member of the federal class action entitled *Marlo v. United Parcel Service, Inc.*, case No. CV 03-04336 DDP (RZx), which was decertified. (See *Marlo v. United Parcel Service, Inc.* (C.D.Cal. 2008) 251 F.R.D. 476.) This individual action was then filed in San Bernardino Superior Court. By order dated November 25, 2009, the action was deemed an "included action" in the coordinated proceeding entitled *United Parcel Service Wage and Hour Cases*, Judicial Council Coordination Proceeding No. 4606. The Second District was designated the court having jurisdiction for intermediate appellate review of the coordinated proceeding. This appeal was subsequently transferred from the Fourth District. Coordinated appeals currently pending before this court are B225089, B225090, B225092, B220250 and B221709.

Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) We independently review the entire record, except as to evidence to which objections were timely made and sustained, in the same manner as the trial court. (*Ibid.*) First, we review the issues framed by the operative pleadings to determine the scope of material issues. We then determine if the moving party has discharged its initial movant's burden of production. If we determine the moving party made the requisite prima facie showing of the nonexistence of a triable issue of fact, we then review the opposing party's submissions to determine if a material triable issue exists. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*); *Todd v. Dow* (1993) 19 Cal.App.4th 253, 258 [23 Cal.Rptr.2d 490].) "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [his or] her evidentiary submission while strictly scrutinizing [defendant's] own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; accord, *Aguilar, supra*, 25 Cal.4th at p. 843.) "The trial judge's stated reason for granting summary judgment is not binding on us because we review its ruling, not its rationale." (*Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1074 [85 Cal.Rptr.2d 627].)

2. *Statutory and regulatory background.*

■ California law governing wages, hours, and working conditions is embodied, to a large extent, in Labor Code section 1171 et seq. and the regulations (wage orders) promulgated by the Industrial Welfare Commission (IWC).[2] The Fair Labor Standards Act of 1938 (FLSA; 29 U.S.C. § 201 et seq.) is the federal counterpart. Both state and federal wage and hour laws reflect the strong public policy favoring protection of workers' general welfare and "society's interest in a stable job market." (*Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1148 [37 Cal.Rptr.2d 718]; see also *Tony & Susan Alamo Foundation v. Sec'y of Labor* (1985) 471 U.S. 290, 296 [85 L.Ed.2d 278, 105 S.Ct. 1953] [FLSA to be interpreted liberally to accomplish purpose]; *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579] [because of remedial nature of legislative enactments concerning wages and working conditions, statutory provisions should be broadly construed to promote protection of employees].)

---

[2] The Legislature stopped funding the IWC in 2004, but its wage orders remain in full force and effect. (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1102, fn. 4 [56 Cal.Rptr.3d 880, 155 P.3d 284].)

The FLSA does not preempt state law and "explicitly permits greater employee protection under state law." (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 795 [85 Cal.Rptr.2d 844, 978 P.2d 2] (*Ramirez*).) In many respects, California law provides broader protection of employee rights, and in such instances, California law controls. (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 567 [59 Cal.Rptr.2d 186, 927 P.2d 296] (*Tidewater Marine*); *Pacific Merchant Shipping Assn. v. Aubry* (9th Cir. 1990) 918 F.2d 1409, 1422, 1426; 29 U.S.C. § 218; 29 C.F.R. § 778.5 (2010).)

■ Generally speaking, California workers are statutorily entitled to overtime compensation for working in excess of a 40-hour workweek or in excess of an eight-hour workday, unless they are properly classified as falling within one of the narrow exemption categories. (See Lab. Code, §§ 510, 515, subd. (a).) The IWC has promulgated numerous wage orders—one concerning the state minimum wage and the balance covering workers employed in various industries. (See Cal. Code Regs., tit. 8, §§ 11000–11170.) IWC wage order No. 9-2001, codified at California Code of Regulations, title 8, section 11090 (Wage Order 9), governs workers employed in the transportation industry. Workers employed in an executive, administrative or professional capacity are exempt from sections 3 through 12 of Wage Order 9, which include provisions concerning overtime compensation, meal and rest periods, and related recordkeeping requirements, among other things. (Cal. Code Regs., tit. 8, § 11090, subd. 1.(A).)[3]

■ "[U]nder California law, exemptions from statutory mandatory overtime provisions are narrowly construed." (*Ramirez, supra*, 20 Cal.4th at p. 794.) They are applied only to those employees " 'plainly and [unmistakably] within their terms and spirit.' " (*Bothell v. Phase Metrics, Inc.* (9th Cir. 2002) 299 F.3d 1120, 1125 (*Bothell*); accord, *Nordquist v. McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 562 [38 Cal.Rptr.2d 221].) Moreover, exemptions are affirmative defenses, and therefore, *the employer bears the burden of proving an employee is properly designated as exempt.* (*Ramirez*, at pp. 794–795; accord, *Corning Glass Works v. Brennan* (1974) 417 U.S. 188, 196–197 [41 L.Ed.2d 1, 94 S.Ct. 2223].)

3. *The summary judgment motion.*

UPS brought its motion contending the executive and administrative exemptions set forth in Wage Order 9 were a complete defense to all of Taylor's claims, as well as arguing several alternative bases for adjudication

---

[3] Additional exemptions to Wage Order 9, not pertinent to our discussion, are set forth at California Code of Regulations, title 8, section 11090, subdivision 1.(B) through (F).

of individual causes of action.[4] A moving defendant may properly meet its burden on summary judgment by conclusively establishing a complete defense to the claim. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra*, 25 Cal.4th at p. 849.) The evidence in support of, and in opposition to, UPS's motion for summary judgment consisted primarily of Taylor's testimony. In its moving papers, UPS relied extensively on excerpts from Taylor's deposition. UPS also offered declarations from several other UPS personnel.

■ In opposition, Taylor offered only his own declaration, which included two one-page exhibits. Taylor also requested the court take judicial notice of portions of the Department of Industrial Relations, Division of Labor Standards Enforcement (DLSE) manual, as well as two opinion letters. The trial court granted Taylor's request. DLSE manuals have been declared void by the Supreme Court for failing to comply with the Administrative Procedure Act (APA) (Gov. Code, § 11340 et seq.) and are therefore entitled to no weight or deference in any judicial interpretation of a wage order. (*Tidewater Marine, supra*, 14 Cal.4th at p. 576.) Nevertheless, a court called upon to consider the applicability of a wage order may still independently determine whether a DLSE interpretation contains persuasive logic. (*Id.* at p. 577.) ■ Agency advice or opinion letters are not characterized as underground regulations violative of the APA and therefore may properly be considered. (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 584 [94 Cal.Rptr.2d 3, 995 P.2d 139] (*Morillion*).)

UPS responded with evidentiary objections to Taylor's declaration, along with resubmitted excerpts of Taylor's deposition testimony and copies of deposition exhibits discussed in the testimony presented with the original moving papers, but apparently inadvertently omitted from the initial papers.[5] Taylor did not submit any written objections to UPS's moving or reply papers.

A majority of the material facts were undisputed, with Taylor conceding their accuracy but arguing they were not relevant to the evaluation of the exemption defenses. We summarize here the most pertinent facts relevant to an understanding of the issues, keeping in mind our standard of review and

---

[4] The operative original complaint stated six causes of action: failure to pay overtime (Lab. Code, §§ 510, 1194), failure to provide meal and rest breaks (*id.*, §§ 226.7, 512), failure to maintain wage statements (*id.*, §§ 226, 226.3), conversion, injunctive relief, and unfair competition (Bus. & Prof. Code, § 17200).

[5] The court sustained a portion of the defense objections. Taylor raises no contention on appeal that any of these evidentiary rulings were erroneous.

accepting Taylor's evidence and UPS's undisputed evidence as true. (*Raghavan v. Boeing Co.* (2005) 133 Cal.App.4th 1120, 1125 [35 Cal.Rptr.3d 397].) We reserve a more detailed discussion of the relevant evidence to the analysis of the disputed exemption elements below.

UPS is an international shipping company providing transportation of packages throughout California, the United States and the world. UPS is certified as a motor carrier by the United States Department of Transportation. In California, UPS has five designated "districts," one of which is the Southeast California District in which Taylor works. Each district contains multiple "facilities" which, in turn, have one or more "package centers," depending on the size of the facility and the geographic area it serves. Smaller facilities may have just one package center. Facilities are also referred to as "hubs" or, if one of the smaller facilities, a "local sort." The hub terminology derives from UPS's identification of its sorting system as a series of "hubs" and "spokes" through which packages travel until finally reaching their destination. Each package center serves a specific geographic region. Some package centers also house additional functions, like car wash operations and customer counters.

UPS drivers operate "package cars," which are the ubiquitous brown delivery trucks. There are drivers with assigned routes, as well as "cover" or "utility" drivers who fill in when necessary. Drivers are part of designated driver teams who service a particular geographic region for a specific package center. When packages arrive at a UPS facility, employees called "unloaders" unload the packages, and then employees called "sorters" sort the packages to start them through the UPS system. Employees called "loaders" load the packages based on whether the next leg of the journey is by ground or by air. If by ground, the packages are placed onto large tractor-trailers called "feeders," and if by air, the packages are loaded into "containers." The packages are then transported through the UPS hub-and-spoke system until they reach their destination package center for final delivery. At the destination package center, employees called "preloaders" sort the packages and load them onto package cars for the drivers in that center to deliver. Drivers, unloaders, loaders, preloaders and sorters are all hourly, nonexempt job positions at UPS. Package centers have additional support staff, including administrative clerks, who check incorrect addresses and perform other similar tasks, as well as seasonal staff to assist units during higher volume periods, like the holiday season.

Taylor has worked for UPS since 1979. During the time period relevant to this action (May 1999 to the present),[6] Taylor has held three different job positions. He was an air hub full-time supervisor (Hub Supervisor) from 1998 to August 2000 in the Ontario facility. He was an on-road supervisor (ORS) from August 2000 through October 2005 in the Riverside facility. His current job position is "Center Manager," also sometimes referred to as a business manager. He has held this position since November 1, 2005, first in the Ontario facility and presently in the San Bernardino facility.

As a Hub Supervisor in the Ontario facility, Taylor was responsible for the day sort air unload operation (Day Sort Operation), which included supervision of the container unload, feeder unload, sort aisle, small sort and irregular parcel operations. While an ORS in the Riverside facility, which had just one package center, Taylor was responsible for a specific driver team, plus the local sort and car wash operations. In the Ontario facility, there are four package centers, one of which is the Corona center. When Taylor first became a Center Manager, he was put in charge of the Corona package center. In 2009, Taylor was transferred to oversee one of two package centers in the San Bernardino facility, the San Bernardino West package center. As a Center Manager, Taylor is in charge of all of the operations housed in that package center.

In all three job positions, Taylor has regularly worked in excess of eight hours a day, often as many as 10 to 12 hours. He also has often felt compelled, due to the press of business, to skip breaks and take a "working lunch," eating a sandwich at his desk and continuing to work. All three job positions have been salaried positions paying more than double the state minimum wage, starting at approximately $4,800 per month as a Hub Supervisor up to his current salary as Center Manager of approximately $7,115 per month. Since 1999, Taylor has received management incentive program awards consisting of stock. His annual stock "awards" ranged in value from $9,385.59 to $18,506. During that same time period, Taylor has also received annual monetary bonuses equal to a half-month's salary. Nonexempt hourly employees at UPS are not eligible to receive stock awards through the management incentive program. Taylor has supervised numerous hourly employees and lower level full-and part-time supervisors while holding each of the three job positions.

In granting summary judgment in favor of UPS, the court ruled UPS established as a matter of law that Taylor was an exempt executive employee and an exempt administrative employee while working as a Hub Supervisor, an ORS, and a Center Manager. Because the gravamen of the complaint was

---

[6] Taylor alleged an expanded period of potential liability based on tolling of the statute of limitations due to the pendency of the federal class action.

based on the claimed misclassification of Taylor as exempt, all six claims were based on the alleged failure to pay overtime and other benefits that accrue to nonexempt employees, as well as civil penalties related thereto. As such, the trial court's determination that Taylor was properly classified as exempt was dispositive of the entire complaint. The court's ruling therefore did not specifically rule on the alternative bases for adjudication of individual causes of action separately noticed by UPS.[7]

Taylor raises two issues on appeal: He contends there are triable issues of material fact as to whether he was misclassified as an exempt executive employee and whether he was misclassified as an exempt administrative employee. We conclude the trial court correctly ruled as a matter of law that Taylor was an exempt employee.

4. *There is no material triable issue concerning applicability of the executive exemption.*

In order to discharge its burden to show Taylor was exempt as an executive employee pursuant to Wage Order 9, UPS was required to demonstrate the following: (1) his duties and responsibilities involve management of the enterprise or a "customarily recognized department or subdivision thereof"; (2) he customarily and regularly directs the work of two or more employees; (3) he has the authority to hire or terminate employees, or his suggestions as to hiring, firing, promotion or other changes in status are given "particular weight"; (4) he customarily and regularly exercises discretion and independent judgment; (5) he is primarily engaged in duties that meet the test of the exemption; and (6) his monthly salary is equivalent to no less than two times the state minimum wage for full-time employment. (Cal. Code Regs., tit. 8, § 11090, subd. 1.(A)(1).) Because the exemption uses conjunctive language, UPS was required to establish *all* of the elements. (*Eicher v. Advanced Business Integrators, Inc.* (2007) 151 Cal.App.4th 1363, 1372 [61 Cal.Rptr.3d 114] (*Eicher*); accord, *Bothell, supra*, 299 F.3d at p. 1125; see also *Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 861 [80 Cal.Rptr.2d 803, 968 P.2d 514] (*Kobzoff*).)

Determining whether or not all of the elements of the exemption have been established is a fact-intensive inquiry. The appropriateness of any employee's classification as exempt must be based on a review of the actual

---

[7] The court's order indicates the motion was deemed moot as to the fourth cause of action for conversion in light of the court's separate order disposing of that claim, on grounds unrelated to the exemptions, by way of motion for judgment on the pleadings. Taylor has not raised any issue on appeal regarding the court's ruling on the motion for judgment on the pleadings.

job duties performed by that employee. Wage Order 9 expressly provides that "[t]he *work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work*, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered . . . ." (Cal. Code Regs., tit. 8, § 11090, subd. 1.(A)(1)(e), italics added; see also *Ramirez, supra*, 20 Cal.4th at p. 802.) No bright-line rule can be established classifying everyone with a particular job title as per se exempt or nonexempt—the regulations identify job duties, not job titles. "A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations . . . ." (29 C.F.R. § 541.2 (2010); see also *Ramirez, supra*, at p. 802 [determination based on job title alone would allow employer to improperly exempt employees by creating idealized job title or job description not reflective of actual work performed].)

■ Despite Taylor's argument to the contrary, federal law is relevant to this inquiry. Taylor argues the trial court incorrectly relied on federal law in rendering its decision. It is true that " 'federal authorities are of little if any assistance in construing state regulations which provide greater protection to workers.' [Citation.] Indeed, 'federal law does not control unless it is more beneficial to employees than the state law.' [Citation.]" (*Morillion, supra*, 22 Cal.4th at p. 594.) However, simply because federal cases are not controlling does not mean they are irrelevant.

Federal law interpreting *similar components* of the FLSA exemptions is properly considered as persuasive authority, even if *not binding* on this court. Indeed, Wage Order 9 expressly provides that "activities constituting exempt work and non-exempt work *shall be construed in the same manner as such items are construed in the following regulations under the [FLSA]* effective as of the date of this order: 29 C.F.R. Sections 541.102, 541.104–111, and 541.115–116." (Cal. Code Regs., tit. 8, § 11090, subd. 1.(A)(1)(e), italics added.)[8] The effective date of Wage Order 9 was January 1, 2001. As such, we may properly consider federal decisions interpreting the FLSA and the federal Department of Labor's implementing regulations as set forth in the Code of Federal Regulations that were in effect as of January 1, 2001 (prior to the 2004 amendments to the federal provisions).

Equally unavailing is Taylor's assertion that federal law is inapposite because of the use, prior to the 2004 amendments, of a "short test" and "long test" in analyzing federal exemption classifications, tests that are not used under California law. Federal law need not be ignored for this reason. Federal

---

[8] Prior versions of Wage Order 9 did not incorporate the FLSA provisions.

law may properly be deemed an appropriate analytical tool in looking at how *similar* individual elements of the exemptions are interpreted. (*Alcala v. Western Ag Enterprises* (1986) 182 Cal.App.3d 546, 550 [227 Cal.Rptr. 453] (*Alcala*); *Bell v. Farmers Ins. Exchange* (2001) 87 Cal.App.4th 805, 814–815 [105 Cal.Rptr.2d 59] (*Bell II*).) Doing so does not impose the federal short and long tests onto the California scheme. With the exception of the "primarily engaged" element, which is more exacting under state law, the individual elements of the executive and administrative exemptions are substantially similar. And, as noted above, Wage Order 9 expressly directs that its provisions be interpreted in accord with similar provisions of the FLSA. We therefore find no error in looking to appropriate federal cases for potential guidance. With the foregoing in mind, we turn to the individual elements of the executive exemption, remaining mindful that the exemption must be separately analyzed for each of Taylor's three job positions at issue.

### a. *There is no dispute as to the salary and supervision elements.*

Taylor does not dispute that he made the requisite salary or that he customarily and regularly supervised two or more employees in each of the three job positions at issue. We therefore need not discuss those two elements. However, Taylor contends that under California law interpreting Wage Order 9 and applying the appropriate deference to his evidence as the opposing party, there are triable issues as to the remaining elements: (1) whether he was in charge of a recognized department or subdivision of UPS, (2) whether he was primarily engaged in exempt management duties, (3) whether he had authority with respect to making hiring and firing decisions regarding other employees, and (4) whether he customarily exercised discretion and independent judgment. We turn now to an examination of the evidence as to these four elements.

### b. *Customarily recognized department or subdivision.*

Taylor argues there is a triable issue as to whether he managed a recognized department or subdivision of UPS. We disagree. There is a dearth of case law interpreting the rather simple phrase "customarily recognized department or subdivision thereof." The federal regulation expressly incorporated into Wage Order 9 defines the phrase "customarily recognized department or subdivision" as distinguishing "between a mere collection of men assigned from time to time to a specific job or series of jobs and *a unit with permanent status and function.*" (29 C.F.R. § 541.104(a) (July 1, 1988), italics added.)[9] Further interpretive guidance from the federal regulation states an exempt executive must be more than "merely a supervisor . . . [who]

---

[9] Hereafter, all citations to the Code of Federal Regulations, unless otherwise indicated, are to the pre-2004 version, revised as of July 1, 1988.

merely participates in the management of the unit. He [or she] must be in charge of and have as his [or her] primary duty the management of a *recognized unit which has a continuing function.*" (*Ibid.*, italics added.) And, while not mandatory, "a fixed location and continuity of personnel are both helpful in establishing the existence of such a unit." (*Id.*, § 541.104(c).)

■ A few federal cases have concluded that a shift of specific workers regularly performing the same, defined function within a larger organization qualifies as a "department or subdivision" within the meaning of the federal regulation. (See *West v. Anne Arundel County, Maryland* (4th Cir. 1998) 137 F.3d 752, 763 ["station or a shift constitutes a recognized department or subdivision" of fire department]; *Scherer v. Compass Group USA, Inc.* (W.D.Wis. 2004) 340 F.Supp.2d 942, 949–950 [food preparation or kitchen staff supervised by chef and operated separately from service staff properly deemed to be subdivision of larger catering department]; *Joiner v. City of Macon* (M.D.Ga. 1986) 647 F.Supp. 718, 722 [day and night shift bus drivers occupied "permanent and continuous position" within larger transit system and deemed part of recognized unit].) We find these cases instructive and conclude that a shift of specific workers, performing the same primary function as a permanent unit operating within a larger organizational structure, and recognized and supervised as such within that organization, constitutes a customarily recognized "department or subdivision" within the meaning of Wage Order 9.

As a Center Manager, Taylor admits he is in charge of a package center and does not dispute that a UPS "package center" qualifies as a customarily recognized department or subdivision. However, Taylor contends this element was not established by UPS with respect to his positions as a Hub Supervisor and an ORS. The record does not support his contention. Taylor admitted that as a Hub Supervisor, he was in charge of a specific group of workers with a defined and permanent function in the overall package delivery operation. He further admitted the Day Sort Operation he supervised was recognized by UPS as a unit with a separate function on internal UPS reports.

Similarly, Taylor admitted in deposition that as an ORS he was in charge of a designated driver team, which consisted of a specific set of drivers, including route drivers and utility drivers, covering a permanent and specific geographic area and performing the same operational function every day. The undisputed evidence also established Taylor was responsible for the local sort in the Riverside facility, which had a permanent, recognized status within that package center. There is no evidence showing that any of these units within UPS were temporary in nature or other than a permanent subdivision of UPS, with assigned employees performing regular and specific functions in the same location as part of the overall package delivery system.

Taylor's effort to minimize his admissions by way of a declaration containing the mere conclusions he was "only" a supervisor who reported to the center manager, the manager was in charge of the overall package center, and he was not given a separate budget for his units while acting as a Hub Supervisor or an ORS is insufficient to raise a triable issue on this element. The declaration is largely without evidentiary facts, in contrast to Taylor's more detailed responses to deposition questions and his admissions in the opposition separate statement. Taylor failed to rebut UPS's evidence showing that subdivisions of the package centers, such as the Day Sort Operation, are customarily recognized by UPS as separate units with permanent functions, status, and defined shifts of workers. Even with the deferential standard of review for opposing evidence, no material triable issue can be gleaned from this record. "A common defect of . . . declarations is the recital of legal conclusions or ultimate facts, instead of statements of evidentiary facts." (6 Witkin, Cal. Procedure (5th ed. 2008) Proceedings Without Trial, § 227, p. 668.) The minimal opposing evidence was insufficient to support a finding in Taylor's favor on this element and therefore insufficient to defeat summary judgment. The undisputed evidence established that as a Center Manager, a Hub Supervisor, and an ORS, Taylor supervised a specific, identifiable group of employees who performed a regular set of specific tasks for a designated geographic region within permanent units.

### c. *Primarily engaged in management-related duties.*

 Taylor further argues there is a triable issue as to whether he was primarily engaged in exempt management duties. We disagree. Under California law, the phrase "primarily engaged" means "more than one-half of the employee's worktime" is spent performing duties that qualify as exempt. (Lab. Code, § 515, subd. (e); see Cal. Code Regs., tit. 8, § 11090, subd. 2.(J).) Exempt management work includes not only the "actual management of the department and the supervision of the employees therein, but also activities which are closely associated with the performance of . . . such managerial and supervisory functions or responsibilities. The supervision of employees and the management of a department include a great many directly and closely related tasks which are different from the work performed by subordinates and are commonly performed by supervisors because they are helpful in supervising the employees or contribute to the smooth functioning of the department for which they are responsible." (29 C.F.R. § 541.108(a).)

Taylor's principal job duties in all three positions were to manage and supervise a defined unit of employees—classic nonmanual management duties. Taylor admitted, without qualification, that *all* of the job duties identified in the job descriptions for Hub Supervisor, ORS and Center Manager accurately described the work he regularly performed in those

capacities and that he was unable to articulate any other major job responsibilities.[10] We need not enumerate in detail each category of work set forth in the job descriptions, but rather set forth a representative sample of the job duties, which Taylor expressly acknowledged to be an accurate reflection of the work he actually performed.

With respect to the Hub Supervisor position, Taylor admitted his primary duties included the following: reviewing daily operational reports to manage productivity and performance; meeting with union officials to improve employee relations; ensuring proper staffing levels and determining training needs; reviewing training and auditing documentation to verify compliance with UPS and regulatory requirements; assessing productivity, service, and financial performance; and providing constant feedback, motivation and support to personnel to improve performance. He also testified to the following duties: participating in daily presort meetings with other management to assess package volume for that day, determining if modifications to workflow were necessary; "directing the operation" and determining how to fix any problems, e.g., a jammed belt, a hazmat spill; participating in postsort meetings with other management to assess the efficiency of the unit and determine problem areas to be corrected; scheduling vacation time, allocating staffing and assessing needs for seasonal help; and assessing employee performance.

As to the ORS position, Taylor admitted his primary job duties included the following: preparing performance reviews, accident reports, and other administrative reports concerning service failures, training and similar matters; completing driver audits to ensure adherence to UPS policies and procedures; determining employee training needs; participating in development and implementation of work process plans to promote efficiency; administering disciplinary process and involving upper management and/or union officials as necessary; reviewing monthly cost statements to ensure operational expenditures were within budget; working with the human resources department to ensure implementation of a health and safety plan; communicating with customers to respond to service concerns; and uncovering and developing business opportunities. Taylor identified the following additional duties: addressing and solving customer concerns; training and auditing drivers on performance, safety and appearance issues (approximately three to four times per week); disciplining drivers not performing up to UPS standards; participating with other management in morning dispatch meetings to make decisions about how to balance the work among package cars and drivers; working with drivers handling or covering an unfamiliar route, including joining them on the road and guiding them through their deliveries;

---

[10] A written job description, like a job title, may be inadequate evidence standing alone to establish this element. However, Taylor expressly admitted the job descriptions were accurate.

checking the building after a dispatch to ensure no packages were left behind and if so, making a decision about how best to get that package timely delivered with a cover driver or other solution; and reviewing and auditing payroll to ensure these were no timecard errors by employees, ordering supplies and other office work.

Finally, as to the Center Manager position, Taylor conceded his job duties included developing and implementing dispatch plans to maximize center efficiency; managing day-to-day center operations; reviewing monthly cost statements to ensure expenditures were within budget; analyzing information and reports to identify trends and create business improvement plans; coordinating with district management to troubleshoot operational and service inefficiencies; working with the human resources department to ensure implementation of a health and safety plan; monitoring employee training; overseeing audits to ensure compliance with UPS procedures and government regulations; conducting performance evaluations, providing feedback and managing employee career development; making salary recommendations; maintaining relationships with union officials to promote labor relations; and building customer relations.

Taylor further described his duties as Center Manager to include approving employee timecards; altering or adjusting work assignments; scheduling days off and vacation time and ensuring appropriate coverage; engaging in conference calls (three to four times per week) with district heads regarding performance and safety issues; auditing drivers on the road and assessing employee performance generally; making in-person visits to customers to thank them for business and inquire as to any unaddressed service needs; enforcing meal and rest period policy; reviewing morning reports to assess center performance and determine areas for improvement; adjusting package car routes based on package volume; and "oversee[ing] the whole [package] center."

The work in which Taylor was primarily engaged consisted of precisely the types of responsibilities identified as "management duties" by the DLSE, the state agency charged with enforcing the IWC wage orders. "Some examples of management duties which DLSE will accept include: 'Interviewing and selecting employees; training employees; setting of rates of pay and hours of work; directing the work of employees; maintaining production or sales records; appraising work performance; recommending changes in status; handling complaints; disciplining employees; planning work schedules; determining techniques to be used; apportioning work among workers; determining the type of materials, supplies, machinery or tools to be used; controlling the flow and distribution of materials, merchandise or supplies; controlling revenue and expense; and providing for the safety of employees and property.' [¶] The above list is not inclusive or exclusive." (Dept. Industrial

Relations, DLSE, opinion letter (July 6, 1993) p. 5; see also *Bell II, supra,* 87 Cal.App.4th at p. 815 [agency opinions " ' "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance" ' "].)

Moreover, Taylor conceded that as a Hub Supervisor, ORS and Center Manager, he *did not perform nonexempt hourly work,* with two exceptions. He explained that while an ORS, he occasionally assisted a driver who was behind with package delivery. But, when asked about how often that had occurred, Taylor admitted "not very much." Taylor also described one incident as a Center Manager when a union grievance was filed against him for placing several packages on a sorting belt. However, he unequivocally stated in his opposition declaration that none of his positions included driving a package car (nonexempt work) as part of his regular duties.

■ Taylor's opposition is thus devoid of any facts raising a triable issue that he regularly engaged in nonexempt duties. Instead, he simply set forth, in conclusory fashion, a litany of management-level duties he does *not* perform (e.g., financial planning, negotiating or setting salary or pay rates, making significant purchasing decisions, entering into vendor contracts). This is not evidence raising a triable issue that Taylor is not regularly performing exempt duties. There is no requirement that in order to be properly classified, an executive must carry out every conceivable function that can be classified as an exempt duty. The fact that he does not perform some traditional management duties does not in any way discredit Taylor's own admissions that the work he does actually perform, and has performed in the past, qualifies as management or supervisory duties or work directly related thereto.

■ Finally, the expectation of supervisors is relevant to the "primarily engaged" inquiry. Wage Order 9 expressly provides that the employer's "realistic expectations" of what work will be performed is part of the analysis. (Cal. Code Regs., tit. 8, § 11090, subd. 1.(A)(1)(e).) The declarations of Taylor's supervisors, Richard Sperry and Eric DeCoud, corroborated Taylor's testimony as to the managerial nature of his regular work duties. The only reasonable inference from the record is that Taylor was a management-level employee "primarily engaged" in exempt supervisory and management-related duties with respect to all three disputed job positions within the meaning of Wage Order 9.

d. *Authority to hire or fire.*

■ Taylor further contends there is a triable issue as to whether he had authority to hire or fire employees. Once again, we must disagree. In order to satisfy this element of the executive exemption, the managerial or supervisory

employee need not have final authority to hire or fire. It is sufficient if his or her *"suggestions and recommendations* as to hiring or firing and as to advancement and promotion or any other change of status of the employee who[m] he supervises will be *given particular weight."* (29 C.F.R. § 541.106, italics added; see Cal. Code Regs., tit. 8, § 11090, subd. 1.(A)(1)(c).)

It is undisputed Taylor did not participate in initial hiring decisions. However, he was a part of the process of promoting and discharging employees. UPS presented Taylor's deposition testimony in which he conceded that as a Center Manager, he had discharged employees for various reasons, including a driver for failing to honestly report an on-duty accident. He also conceded one of his job duties as a Center Manager was to "manage and develop" employees, which included providing regular performance appraisals and assisting in achieving career development goals at UPS.

Taylor admitted that, as an ORS, he could recommend that an employee be discharged, so long as he had a documented reason for his recommendation, although he could not recall a specific instance of having done so. He also participated in performance reviews and reviews of new drivers' "training packets" for purposes of promoting them from probationary to seniority status. Taylor explained he would speak with his manager and give his opinion on changes in seniority status, and that he believed in the majority of cases his recommendations were followed.

UPS also presented the declarations of two of Taylor's supervisors. Richard Sperry, Taylor's supervisor for a portion of the time he was a Hub Supervisor, stated he regularly gave Taylor's recommendations to promote employees and to move them from preseniority to seniority status particular weight because of his more immediate involvement with the employees he supervised on a daily basis. Similarly, Eric DeCoud, Taylor's supervisor for a period of time he was an ORS, stated he gave Taylor's recommendations as to promotion and discharge particular weight for the same reason, i.e., Taylor's more intimate daily involvement with the employees under his supervision and resulting knowledge of their skills.

Taylor responded with his declaration, stating he did not have ultimate authority to hire or fire any employee at any time. He further attested that the disciplining of employees was governed by progressive discipline guidelines and a collective bargaining agreement. He declared he recommended that one individual be disciplined but he was told to rewrite his recommendation memo. Finally, he stated that with respect to promoting employees, he would, at most, fill out a simple form indicating whether or not an employee met minimum performance requirements, but he was not given the opportunity to provide subjective input.

Wage Order 9 by its plain language does not require an exempt executive to have the ultimate authority to hire, fire or alter the job status of supervised employees. Taylor's testimony that he did not have ultimate authority to hire or fire any employee is largely immaterial. Taylor's testimony regarding his discharge of employees as a Center Manager establishes that Taylor's discharge decision was capable of being grieved through union procedures; and in the case of the driver he discharged for failing to properly report an accident, that process resulted in the driver getting his job back. However, this fact alone does not raise a material dispute that Taylor's suggestions and recommendations were not given the requisite weight by UPS.

■ Collective bargaining agreements are common in the modern workplace, as are standardized internal personnel policies for progressive discipline, with or without a union presence in the workplace. Such standardized policies and union contracts properly seek to avoid arbitrariness in decisionmaking while fostering equal treatment of employees in promotion and disciplinary matters. The existence of such policies or union contracts will often eliminate *unfettered* discretion in hiring and firing decisions or otherwise provide a mechanism for an employee to challenge a change in job status. That does not mean that the employer does not consider the supervisor's recommendations to be of substantial importance.

This check on discretion cannot reasonably be used to make it impossible for an employer to exempt supervisory and managerial staff engaged in such decisionmaking. If the recommendations or opinions of a supervisor or manager are given "particular weight" by the employer in the overall process of determining whether employees will experience a change in job status, then that supervisor or manager may properly be deemed to fit within the executive exemption. This is so even if the ultimate decision is made by another member of management or if the decision can be grieved or otherwise challenged under a collective bargaining agreement or similar procedure. Any contrary interpretation of the language of Wage Order 9 would be unreasonable and would practically eliminate the executive exemption in any workplace covered by a union contract.

Judging the evidence and all reasonable inferences arising therefrom in the light most favorable to Taylor, there is, at best, speculation on Taylor's part that his recommendations were not often heeded (a point contradicted by his deposition testimony), evidence that one of his recommendations for discipline was overruled in favor of terminating the employee outright, and evidence that any changes in employment status of UPS hourly employees are ultimately governed by a collective bargaining agreement, the substance of which was not offered into evidence. This minimal opposition evidence does not have preponderant weight which would support a jury finding in

Taylor's favor and therefore cannot be deemed to raise a triable issue on this element. (*Aguilar, supra,* 25 Cal.4th at p. ·857 [where opposing evidence showed plaintiff's claim of unlawful conspiracy was less likely than defense claim of permissible competition or at best in equipoise with moving evidence, summary judgment properly granted because reasonable trier of fact could not find for plaintiff on such evidence].)

e. *Exercise of discretion and independent judgment.*

Finally, Taylor argues the trial court erred in concluding as a matter of law that he customarily exercised discretion and independent judgment in performing his job duties. We find no error.

In the pertinent federal regulations, the phrase "exercise of discretion and independent judgment" is defined as generally involving "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term . . . implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." (29 C.F.R. § 541.207(a).)[11] The requirement that discretion be exercised with respect to "matters of significance" means the decision being made must be relevant to something consequential and not merely trivial. (29 C.F.R. § 541.207(d).) For instance, a bookkeeper who determines which accounts to post first is technically exercising some level of discretion as to the appropriate discharge of his or her job duties, but not as to matters of. significance within the meaning of the exemption. (*Ibid.*) And the exercise of discretion must be more than occasional. The "phrase 'customarily and regularly' signifies a frequency which must be greater than occasional but which, of course, may be less than constant." (29 C.F.R. § 541.207(g).)

The only reasonable conclusion arising from the evidentiary record is that Taylor was regularly called upon to exercise his discretion and judgment on matters of consequence. As set forth in part 4.c., *ante,* at pages 1018 through 1021, Taylor admitted to the accuracy of the written job descriptions of his three positions. The majority of those job responsibilities necessarily includes the exercise of discretion and judgment on matters of significance to UPS operations, including, for example, training employees and appraising employee performance; imposing discipline on his own initiative, including

---

[11] The pre–2004 federal regulations implementing the FLSA use the phrase "discretionary powers" with respect to the executive exemption (29 C.F.R. § 541.107), reserving "exercise of discretion and independent judgment" for the administrative exemption. (29 C.F.R. § 541.207(a).) However, Wage Order 9 under California law expressly includes the phrase "exercise of discretion and independent judgment" for both exemptions, and therefore we look to section 541.207 for interpretative guidance as to both state law exemptions.

having the authority to talk with an offending employee to attempt to correct the problem before proceeding through the progressive discipline system; "trouble-shooting" for operational inefficiencies, determining their "root cause" and making appropriate adjustments; developing and implementing "strategic plans" or "action plans" for his unit on a monthly basis to improve unit efficiency; giving advice to employees on how to address problems arising in the field; and building customer relationships.

Taylor was responsible for making numerous discretionary decisions on a daily basis, with little or no supervision, and usually under time-sensitive, pressure-filled conditions given the nature of the service UPS provides—decisions that impacted how numerous employees under his supervision performed their jobs, including timely responding to problems that developed over the course of the workday. Because each unit at UPS is dependent on the smooth functioning of the other units, poor decisionmaking or lack of operational discipline in one unit could have real consequences to UPS's business and general good will with its customers. Taylor admitted that because of UPS's integrated package delivery system, "[o]ne late operation naturally affects the next step in the operation, which could cause a snowball effect." We perceive no obstacle in concluding as a matter of law that Taylor was customarily and regularly called upon to exercise discretion and judgment in matters of significance to UPS. (*Combs v. Skyriver Communications, Inc.* (2008) 159 Cal.App.4th 1242, 1267 [72 Cal.Rptr.3d 171] (*Combs*) [employee primarily responsible for troubleshooting network issues for Internet service provider engaged in work of significance to entity]; *Perine v. ABF Freight Systems, Inc.* (C.D.Cal. 2006) 457 F.Supp.2d 1004, 1016 [dispatcher at one facility of shipping company responsible for assigning and coordinating drivers engaged in work significant to overall operations]; *Piscione v. Ernst & Young, L.L.P.* (7th Cir. 1999) 171 F.3d 527, 537 [staff consultant analyzing benefit plans and also responsible for supervising and developing junior employees exercised requisite level of discretion].)

Taylor nevertheless argues there is a triable issue because all of his decisionmaking was dictated by stringent UPS procedures and methods. Taylor testified that supervisors are required to follow the daily operating plan (daily plan) issued by the Industrial Engineering Department, and that deviations from the daily plan have to be authorized by the division manager; that UPS's "loop principles" set forth how adjustments to individual driver's routes and package loads can be adjusted; that his decisionmaking is governed by UPS "decision trees," which specify how to implement a designated response procedure when various situations arise (for instance, how to respond to a driver who gets into an accident en route); and that in each position, he has always had a higher level manager to whom he reported. He contends his evidence showed he merely applied his skill and knowledge of

UPS methods and procedures in discharging his duties and was otherwise constrained from deviating from them.

The federal regulations warn of misclassifying employees on this basis. "Perhaps the most frequent cause of misapplication of the term 'discretion and independent judgment' is the failure to distinguish it from the use of skill in various respects. An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment . . . . This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specific standard." (29 C.F.R. § 541.207(c)(1).)

 While we agree an employee constrained by stringent protocols mandating a particular outcome to routine tasks would not be exercising discretion of the type contemplated by Wage Order 9, merely because an employer requires adherence to regulations, guidelines or procedures does not mean an executive does not exercise discretion or judgment. The modern workplace is a regulated workplace (e.g., safety and health provisions pursuant to the California Occupational Safety and Health Act of 1973 [Lab. Code, § 6300 et seq.], antidiscrimination provisions pursuant to the California Fair Employment and Housing Act [Gov. Code, § 12900 et seq.]), often overlayed by internal policies and procedures (e.g., personnel policies, union contracts, quality control guidelines). We cannot interpret Wage Order 9 in a vacuum, ignoring this reality.

We conclude that where government regulations or internal employer policies and procedures simply *channel* the exercise of discretion and judgment, as opposed to *eliminating* it entirely or otherwise constraining it to a degree where any discretion is largely inconsequential, the executive exemption may still apply. Supervisors and managers are not rendered mere automatons because they must navigate each workday mindful of regulations and internal policies governing their work environment and the employees they oversee. Such an interpretation of the language of Wage Order 9 would render the exemptions virtually nugatory—inapplicable to any employee save for the uppermost tier of corporate officers or high-level management. Our charge to construe exemptions narrowly is not a directive to render them nonexistent.

In any event, despite arguing he was required to follow detailed methods and procedures which eliminated any discretion in the discharge of his duties,

Taylor's evidence showed the opposite. Taylor actually admitted the UPS "methods" and procedures only apply to UPS *drivers*. He conceded that he is not aware of *any* written UPS methods defining or directing how a Center Manager is supposed to carry out his functions overseeing a package center. He also could not identify any written methods or protocols covering how an ORS is to perform his or her job. The same question was not posed to Taylor with respect to his Hub Supervisor position, but the record nevertheless establishes that, given the nature of his duties, he necessarily exercised the requisite level of discretion and was not regularly constrained by any rigid procedures which foreclosed the exercise of discretion and judgment.

Taylor's opposing evidence showed only that he was required to adhere to some internal *guidelines* in discharging *some* of his duties, like the daily plan. His conclusory declaration did not provide any material facts indicating, for instance, that in adhering to the daily plan or following a "decision tree" as a managerial-level employee, he was thereby constrained or limited to one course of action in his decisionmaking. (6 Witkin, Cal. Procedure, *supra*, § 227, p. 668.) Given the nature of the duties that Taylor admitted he regularly performed in each of his job positions, it belies logic and common sense to equate those duties with rote, mechanical work lacking the requisite degree of discretion. At best, Taylor established there are some internal guidelines and methods that impact his work, but nothing that eliminates or materially constrains his discretion and judgment. (*Haywood v. North American Van Lines, Inc.* (7th Cir. 1997) 121 F.3d 1066, 1073 [customer service representative for shipping company exercised discretion despite having to use company guidelines to resolve damage claims and other complaints by customers].)

Finally, simply because Taylor reported to a higher level manager in each of his job positions does not mean he did not exercise the requisite discretion. Nothing in the plain language of Wage Order 9 indicates the exemption applies only to the most senior management of an enterprise or the person with whom the proverbial "buck" stops. To the contrary, the federal regulations instruct that an exempt executive employee need *not* be a final decision maker. The requirement that an executive exercise discretion and independent judgment "does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment . . . ." (29 C.F.R. § 541.207(e).)

██ Based on the undisputed evidence in the record, Taylor was clearly and unmistakably an executive employee within the meaning of Wage Order 9 and, as such, properly classified as exempt. There was no material disputed evidence supporting a finding in his favor on this element. (*Aguilar, supra*, 25 Cal.4th at p. 857.) Summary judgment was therefore correctly granted on that basis alone. Summary judgment was also properly granted on the basis of the administrative exemption, to which we now turn.

5. *There is no material triable issue of fact as to the applicability of the administrative exemption.*

██ In order to establish that Taylor was exempt as an administrative employee, UPS was required to show *all* of the following: (1) his duties and responsibilities involve the performance of office or nonmanual work directly related to management policies or general business operations of UPS; (2) he customarily and regularly exercises discretion and independent judgment; (3) he performs work requiring special training, experience, or knowledge under general supervision only (the two alternative prongs of the general supervision element are not pertinent to our discussion); (4) he is primarily engaged in duties that meet the test of exemption; and (5) his monthly salary is equivalent to no less than two times the state minimum wage for full-time employment. (Cal. Code Regs., tit. 8, § 11090, subd. 1.(A)(2).)

██ Like the executive exemption, the administrative exemption contains conjunctive language, and therefore, UPS was required to affirmatively establish the applicability of all the elements in order to be entitled to judgment. (*Eicher, supra*, 151 Cal.App.4th at p. 1372; *Bothell, supra*, 299 F.3d at p. 1125; *Kobzoff, supra*, 19 Cal.4th at p. 861.) The evaluation of whether all elements of the administrative exemption have been established requires the same fact-intensive inquiry as described in part 4., *ante*, at pages 1014 through 1016, with respect to the executive exemption. (Cal. Code Regs., tit. 8, § 11090, subd. 1.(A)(2)(f) [actual work performed by employee must be examined].) And federal law interpreting *similar* provisions of the administrative exemption under the FLSA are appropriately considered as instructive. (*Bell II, supra*, 87 Cal.App.4th at pp. 814–815; *Alcala, supra*, 182 Cal.App.3d at p. 550; *Comb, supra*, 159 Cal.App.4th at pp. 1253–1255 [discussing use of federal law as persuasive authority in interpreting administrative exemption under wage order No. 4-2001]; Cal. Code Regs., tit. 8, § 11090, subd. 1.(A)(2)(f) [incorporating 29 C.F.R. §§ 541.201–205, 541.207–208, 541.210, 541.215 into Wage Order 9].)

a. *There is no dispute as to salary and general supervision elements.*

As already set forth above, Taylor does not dispute that in each of his three job positions, he earned more than twice the state minimum wage. Additionally, Taylor does not raise any argument on appeal that the court incorrectly analyzed the general supervision element. Taylor has therefore forfeited any claim of error on this ground. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [57 Cal.Rptr.3d 363].) In any event, we note for the record that our review of the evidence supports the conclusion that it was undisputed Taylor worked under minimal, general supervision in all three job positions. Accordingly, we turn to a discussion of the disputed elements: (1) whether Taylor was primarily engaged in the performance of office or nonmanual work directly related to the management policies or general business operations of UPS, and (2) whether Taylor customarily and regularly exercised discretion and independent judgment.

b. *Primarily engaged in work directly related to the management policies or general business operations of UPS.*

Taylor contends the evidence shows he was a "production" level employee and not primarily engaged in duties directly related to the management policies or general business operations of UPS and, therefore, not properly classified as an employee acting in an administrative capacity pursuant to Wage Order 9. Once again, we disagree.

 Taylor relies on an unduly narrow and rigid application of the analytical tool known as the "administrative/production worker dichotomy" as described in *Bell II, supra*, 87 Cal.App.4th 805, 819–823. In simple terms, the administrative/production dichotomy defines administrative employees primarily engaged in servicing or " 'administering the business affairs of the enterprise' " (*id.* at p. 821) as distinct from production-level employees whose " 'primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market.' [Citation.]" (*Ibid.*) Taylor contends that, using this analytical framework, he cannot be deemed anything other than a production-level employee because he participated directly in the running of the package delivery system—the primary function of UPS as a business enterprise.

We reject the suggestion that every enterprise can be subjected to a simplistic parsing of its "primary" business function for purposes of labeling administrative versus production-level, rank-and-file workers. Instead, we agree with both state and federal courts that have held the administrative/production dichotomy is "but *one analytical tool,* to be used only to the extent it clarifies the analysis." (*Bothell, supra*, 299 F.3d at p. 1127, italics added; accord, *Combs,*

*supra*, 159 Cal.App.4th at pp. 1259–1260.) Even *Bell II* warns against overreliance on the dichotomy, stating that many employees cannot be properly characterized in terms of the dichotomy and, of particular relevance here, that some "employees perform jobs involving wide variations in responsibility that may call for finer distinctions than the administrative/production worker dichotomy provides." (*Bell II, supra*, 87 Cal.App.4th at pp. 826–827.)

■■ The facts and law simply do not support Taylor's contention he was a production-level employee. Wage Order 9 expressly incorporates 29 Code of Federal Regulations part 541.205, the federal regulation providing some explication of the phrase "directly related to management policies or general business operations." (Cal. Code Regs., tit. 8, § 11090, subd. 1.(A)(2)(a)(i).) That part provides, in pertinent part, that an employee acting in an administrative capacity directly related to the management policies or business operations of the employer need not directly participate in "the formulation of management policies or in the operation of the business" enterprise as a whole. (29 C.F.R. § 541.205(c).) An employee whose responsibility is to "execute or carry" out management policies may also be considered within the scope of the exemption, even though his or her responsibilities are limited to only "a particular segment of the business." (*Ibid.*)

Considering Taylor's deposition testimony and the other evidence in the light most favorable to Taylor, we conclude that a majority of Taylor's regular job functions were administrative in nature. (See part 4.c., *ante*, at pp. 1018–1021.) By Taylor's own admission, he was not regularly engaged at the production level of the UPS system as he did not engage in the loading, unloading, sorting and delivery of packages. Instead, he implemented UPS policy and action plans to promote efficiency so that his units smoothly interfaced with other UPS units in the series of "hubs and spokes" through which packages travel; trained, audited and supervised his employees to promote workplace safety and timely package delivery; and dealt with customers and union officials to promote positive customer and employee relations with management. These job functions can only reasonably be characterized as related to the running of UPS's general business operations.

c. *Exercise of discretion and independent judgment.*

As discussed in part 4.e., *ante*, at pages 1024 through 1028, we conclude the undisputed evidence established that Taylor customarily and regularly exercised discretion and independent judgment within the meaning of Wage Order 9. The undisputed material evidence in the record established, as a matter of law, that Taylor was correctly classified as an exempt administrative employee in each of his three job positions.

## DISPOSITION

The judgment is affirmed. Respondent UPS shall recover its costs on appeal.

Flier, Acting P. J., and O'Connell, J.,[*] concurred.

Appellant's petition for review by the Supreme Court was denied February 23, 2011, S189817.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.