Filed 2/27/14  Mosley v. St. Supéry Vineyards and Winery CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SANDRA MOSLEY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ST. SUPÉRY VINEYARDS AND WINERY et al., <br><br> Defendants and Respondents. | A137373 <br><br> (Napa County <br> Super. Ct. No. 2657246) |

## INTRODUCTION

Plaintiffs Sandra Mosley and Sheri Stukey appeal from the summary judgment entered on their claims for wrongful termination based on age discrimination and for wage and hour violations. They assert the trial court erred in holding they neither established a prima facie case of age discrimination nor established they were owed for meal and rest breaks.  Mosley also asserts the court erred in concluding her claim for late payment of 0.16 hours of overtime was "de minimus" and she was therefore not entitled to a "waiting time" penalty under Labor Code section 203.  We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Mosley and Stukey were working in the bottling department of St. Supéry Vineyards and Winery[1] (St. Supéry) at the time of their termination in April 2011.

---

[1] The other named defendant was Skalli Corporation, doing business as St. Supéry Vineyards and Winery.  "Skalli Corporation does business as 'St. Supéry Vineyards & Winery,' but there is no distinct legal entity with that name."

1

Stukey's job title was "Bottling Manager" and Mosley's job title was "Sr. Bottling Line Worker." Both were over 40 years of age at the time: Mosley was 53 years old and Stukey was 47 years old. Mosley had worked at St. Supéry since 1989, and Stukey since 1988.

It is undisputed "St. Supery lost custom bottling work over a period of years because its prices became prohibitively more expensive than its increasing number of competitors [¶] [and] . . . [t]he decrease in custom bottling work necessarily decreased work in the cellar and barrel departments." In 2008, some of the bottling department employees were laid off. There were "conversations" about laying off Stukey and Mosley at that time, but based on their seniority and the hope the winery "would get some more custom business back," they were not terminated.

Emma Swain became the president and chief executive officer of St. Supéry in 2009. She was directed to make improvements at St. Supéry to obtain a "better return on investment" because the company had "had some very tough years." In order to achieve that goal, St. Supéry "cut[] various areas throughout the company," including not replacing positions, the layoff, and selling off excess inventory. In 2010, a cellar employee was terminated and the position was not filled "because we'd reduced the amount of operations due to the reduction in custom bottling." In February 2011, Stukey told Josh Anstey, Vice President of Vineyard Operations, that Mosley had little work to do and Stukey was "running out of projects" for her.

The April 2011 layoff was of three employees, Stukey, Mosley, and J. J. Broyles, the only employees left in the bottling department. Swain did not consider laying off a worker in a different department in order to move any of the three employees into that job. She did not believe any of the three employees had "the skills to do that and I think there was no reason to do that when those people are working and their department is fine." Swain considered whether Mosley was able to work in the cellar, but "there wasn't sufficient work there to do that." Swain did not recall conversations about moving Stukey to another department, because "I didn't have another department for [Stukey] to run."

2

After the layoff, Sheryl Johnson, the human resources manager, sent an email to all St. Supéry employees stating in part:  "St. Supery's custom bottling work has steadily been decreasing over the past several years, and as an unfortunate consequence it has become increasingly challenging to have sufficient work to keep the bottling line running and the bottling staff productive.  Over the last year we have aggressively pursued custom bottling opportunities without success.  We have made the difficult decision to shut down the full time bottling program, and as a result the more difficult decision to lay off three employees.  As of today, Sheri Stukey, Sandie Mosley, and JJ Broyles have been released from employment. . . .  [¶]  [They] have been loyal, hard-working employees, and we wish them nothing but the best as they transition to new employment.  It's important for you to know that their separation from employment was strictly a business decision based solely on the work slowdown."  Emma Swain received an email in response stating, "What a drag.  You okay?"  Swain responded by email:  "Oh it was horrid, we have been keeping them for a year without any real work—yuck.  I think a few people are reeling, Chris P, and some of the old timers—Michael and me—but it needed to happen."

Stukey and Mosley sued St. Supéry, alleging wrongful termination based on age discrimination on the basis of both disparate treatment and disparate impact, failure to pay overtime, meal periods and rest breaks, wrongful termination in violation of the public policies alleged in the previous four causes of action, and unfair business practices (Bus. & Prof. Code, § 17200 et seq.).

The court granted St. Supéry's motion for summary judgment.  It found neither plaintiff had established a prima facie showing of discrimination, stating:  "Plaintiff[s'] attempts to meet [their] burden of showing circumstances giving rise to an inference of discrimination based on the fact that both of the employees were in the protected class of people over age forty, that they could have taken over jobs of younger people in departments other than bottling, and that, after the lay offs, the person who made the termination decision referred in an email to other long-term employees as 'old-timers.'  The court finds this evidence insufficient to meet plaintiff[s'] initial prima facie burden."

3

The court also found Stukey had not raised a triable issue of fact as to whether she was an exempt employee, and thus granted the motion as to Stukey's causes of action for overtime and meal and rest break violations. The court similarly found no triable issue of fact as to Mosley's claim for meal and rest period violations and for penalties due to late payment for 0.16 hours of overtime.

## DISCUSSION

### Standard of Review

"We review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) "If no triable issue as to any material fact exists, the defendant is entitled to a judgment as a matter of law. [Citations.] In ruling on the motion, the court must view the evidence in the light most favorable to the opposing party. [Citation.] We review the record and the determination of the trial court de novo. [Citations.]" (*Shin v. Ahn* (2007) 42 Cal.4th 482, 499.) The trial court's stated reasons for granting summary relief are not binding on the reviewing court, which reviews the trial court's ruling, not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)

### Age Discrimination Claims

Plaintiffs claim the trial court erred in ruling neither had made a prima facie showing of age discrimination under the Fair Employment and Housing Act (FEHA), under either a disparate treatment or a disparate impact theory.

"Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).) "In California, courts employ at trial the three-stage test that was established in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802 . . . to resolve discrimination . . . . [Citation.] At trial, the employee must first establish a prima facie case of discrimination, showing ' " 'actions taken by the employer from which one can infer, if such actions

4

remain unexplained, that it is more likely than not that such actions were "based on a [prohibited] discriminatory criterion . . . ." ' " ' [Citation.] Once the employee satisfies this burden, there is a presumption of discrimination, and the burden then shifts to the employer to show that its action was motivated by legitimate, nondiscriminatory reasons. [Citation.] A reason is 'legitimate' if it is 'facially unrelated to prohibited bias, and which if true, would thus preclude a finding of discrimination.' [Citation.] If the employer meets this burden, the employee then must show that the employer's reasons are pretexts for discrimination, or produce other evidence of intentional discrimination." (*Reid v. Google, Inc*. (2010) 50 Cal.4th 512, 520, fn. 2, italics omitted.)

"The specific elements of a prima facie case may vary depending on the particular facts. [Citation.] Generally, the plaintiff must provide evidence that (1) he [or she] was a member of a protected class, (2) he [or she] was qualified for the position . . . sought or was performing competently in the position . . . held, (3) he [or she] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz, supra*, 24 Cal.4th at p. 355.) The "other circumstance" can include "replacement by a significantly younger worker with similar qualifications" (*Holtzclaw v. Certainteed Corp*. (E.D. Cal. 2011) 795 F.Supp.2d 996, 1010) or " 'circumstantial, statistical, or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination' " (*Coleman v. Quaker Oats Co.* (9th Cir. 2000) 232 F.3d 1271, 1281).

In the context of a motion for summary judgment brought by the employer, "[a]ssuming the complaint alleges facts establishing a prima facie case that unlawful disparate treatment occurred, the initial burden rests on the employer (moving party) to produce substantial evidence (1) negating an essential element of plaintiff's case or (2) (more commonly) showing one or more legitimate, nondiscriminatory reasons for its action against the plaintiff employee . . . . [¶] The burden then shifts to the plaintiff employee (opposing party) to rebut defendant's showing by producing substantial evidence that raises a rational inference that discrimination occurred; i.e., that the employer's stated neutral legitimate reasons for its actions are each a 'pretext' or

5

cover-up for unlawful discrimination, or other action contrary to law or contractual obligation." (Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2013) ¶¶ 19:728–19:729, pp. 19-84, 19-85, italics omitted.) "By applying *McDonnell Douglas*'s shifting burdens of production in the context of a motion for summary judgment, the judge [will] determine whether the litigants have created an issue of fact to be decided by the jury." (*Horn v. Cushman & Wakefield Western, Inc*. (1999) 72 Cal.App.4th 798, 806 (*Horn*).)

"[T]o avoid summary judgment, an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004–1005.) "[T]he employee [cannot] simply show the employer's decision was wrong, mistaken, or unwise. Rather, the employee ' "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the [asserted] non-discriminatory reasons.' [Citations.]" [Citations.]' [Citation.]" (*Horn*, *supra*, 72 Cal.App.4th at p. 807, italics omitted.)

Plaintiffs assert the trial court erred in concluding they had not established a prima facie showing of age discrimination as to the fourth element: some "other circumstance" suggesting discriminatory motive. (*Guz, supra,* 24 Cal.4th at p. 355.) Plaintiffs contend they established a prima facie case because the winery "retained similarly situated, younger employees to perform their job duties," "Swain never considered RIFing the similarly situated, younger, production employees," "Swain unlawfully used plaintiffs' compensation in deciding to terminate plaintiffs' employment when 'use of that factor adversely impacts older workers as a group,' " and "Swain[] provided direct evidence of ageist animus in an email about the RIF on the day after the RIF." Plaintiffs also assert

6

Swain "looked only to the bottling department[]—the 'age ghetto'[2] in which [plaintiffs] served."

"[A]ge discrimination laws are not 'something akin to a strict seniority protection system.' [Citation.]" (*Guz*, *supra*, 24 Cal.4th at p. 375.) "The laws against age discrimination do not ' "require[] that younger employees be fired so that employees in the protected age group can be hired." ' [Citations.]" (*Ibid.*) Plaintiffs do not dispute the winery had lost a substantial amount of bottling work, and that the "decrease in custom bottling work necessarily decreased work in the cellar and barrel departments." Instead, they claim "Swain never considered a production-wide reassignment of duties," "providing cellar, barrel or compliance work to [plaintiffs] at the expense of less senior, and therefore younger, employees." Even assuming plaintiffs were qualified to perform other duties in different departments, there is no requirement that an employer consider laying off younger employees in other departments rather than the employees of the department that had insufficient work.

Plaintiffs also claim Swain's email comment referencing "old timers" is "direct evidence of ageist animus." "[M]ere discriminatory thoughts or stray remarks are not sufficient to establish liability under the FEHA." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 225.) Although a stray remark alone may not create a triable issue of age discrimination, when combined with other evidence of pretext, an otherwise stray remark may create an " 'ensemble [that] is sufficient to defeat summary judgment.' [Citation.]" (*Reid v. Google, Inc.*, *supra*, 50 Cal.4th at pp. 541–542; see, e.g., *Merrick v. Farmers Ins. Group* (9th Cir. 1990) 892 F.2d 1434, 1438–1439.)

Swain's remark, however, provided no evidence of ageist animus. Swain's comment in full was: " 'Oh it was horrid, we have been keeping [plaintiffs] for a year without any real work—yuck. I think a few people are reeling, Chris P, and some of the old timers—Michael and me—but it needed to happen.' " The plain language of the email and the context in which it was sent make it clear the comment meant the layoffs

---

**2** The characterization of the bottling department as an "age ghetto" was made only by plaintiffs' counsel, not by any employee of the winery.

7

were emotionally upsetting to a number of employees, including employees of longer tenure and Swain herself. The comment was neither negative nor did it suggest any prejudice or bias toward employees over 40. We agree with the trial court it "does not in any manner support an inference of a discriminatory motivation for plaintiff[s'] layoff."

Lastly, plaintiffs assert "the decrease in the average age" of the group of employees to whom certain of plaintiffs' job duties were assigned was sufficient to demonstrate the "other circumstance" element of their disparate treatment claim as well as a prima facie case of disparate impact age discrimination.

" 'To prevail on a theory of disparate impact, the employee must show that regardless of motive, a facially neutral employer practice or policy, bearing no manifest relationship to job requirements, in fact had a disproportionate adverse effect on certain employees because of their membership in a protected group.' [Citations.] '[D]isparate impact is not proved merely because all members of a disadvantaged subgroup are also members of a protected group.' [Citation.] Proof may be offered, 'usually through statistical disparities, that facially neutral employment practices adopted without a deliberately discriminatory motive nevertheless have such significant adverse effects on protected groups that they are "in operation . . . functionally equivalent to intentional discrimination." [Citation.]' " (*Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 817 (*Frank*).)

"Although statistics have a place in a disparate treatment case . . . their utility 'depends on all of the surrounding facts and circumstances.' [Citation.]" (*Sengupta v. Morrison-Knudsen Co., Inc.* (9th Cir. 1986) 804 F.2d 1072, 1075.) Where the " ' "statistical evidence [is] derived from an extremely small universe [it] has little predictive value and must be disregarded." ' " (*Id*. at p. 1076.) "The problem with small labor pools is that slight changes in the data can drastically alter appearances. Consequently, in 1979, the EEOC concluded that statistics from small applicant pools such as a pool of 30 persons are not dispositive." (*Ibid*.)

Plaintiffs maintain they established disparate impact through the use of calculations made by their counsel. They assert the average age of the employees who

8

took over some of Mosley's job duties was 36.9 years old, and that the average age of that group of employees, plus plaintiffs, was 39.3 years of age. They likewise assert the average age of the employees who took over a portion of Stukey's job duties was 41.3, and that the average age of that group, plus plaintiffs, was 42.5 years old. They claim these decreases in the average age of a subset of employees demonstrate disparate impact.

Plaintiffs cite neither case law nor expert opinion in support of the notion the "statistics" their counsel created demonstrate disparate impact. Even a cursory review of these "statistics" reveals the obvious flaw of the very small sample size decried in other cases. Another patent failing of the methodology is the absence of evidence of the amount of plaintiffs' bottling duties taken over by each remaining employee. For instance, while some bottling duties were taken over by younger employees, those employees performed very little bottling work at all after the layoff. Moreover, plaintiffs provide no basis to conclude a reduction in the average age of certain subsets of employees of either 2.4 years or 1.2 years has any statistical or legal significance. Plaintiffs' statistical methodology, entirely of their own making, is simply factually and legally unsupported.

As in *Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, "[t]his case does not fit well within the normal boundary of a disparate impact case. Plaintiff asserts that defendant's reorganization caused a disparate impact on women and those over 40 because the reorganization plan demoted administrative managers, all but one of whom were women, and about half of whom were over 40. Reflecting a basic misunderstanding of the meaning of disparate impact, plaintiff lays great stock in her assertion that 'no other group of employees was adversely affected' by the reorganization. . . . Persons over 40 were not affected as a group. Rather, administrative managers were affected as a group. The evidence reveals nothing more. And the law does not prohibit discrimination against administrative managers." (*Id.* at pp. 1321–1322, italics omitted.)

Similarly here, the law does not prohibit discrimination against bottling department employees. And, as *Frank* explained, " '[D]isparate impact is not proved merely because all members of a disadvantaged subgroup are also members of a

9

protected group.' " (*Frank, supra,* 149 Cal.App.4th at p. 817.) Plaintiffs failed to meet their burden of establishing a prima facie case of either disparate treatment or disparate impact age discrimination.[3]

**Stukey's Overtime, Meal and Rest Period Claims**

Stukey contends the trial court erred in ruling St. Supéry met its burden of "presenting evidence to show that [she] spent the majority of her employment performing duties that satisfied the administrative exemption" to the requirement that workers be paid overtime and given meal and rest periods. She claims she was a "non-exempt 'working foreman' " whose title of "bottling manager" was only "honorific."

"Labor Code section 510, subdivision (a), generally requires payment of overtime compensation at one and one-half times an employee's regular rate of pay for any work in excess of eight hours in one workday or 40 hours in any one workweek. However, [there are] exemptions from that requirement 'for executive, administrative, and professional employees, provided that the employee is primarily engaged in the duties that meet the test of the exemption [and] customarily and regularly exercises discretion and independent judgment in performing those duties . . . .' [Citation.]" (*Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 499, fn. 2.) Similarly, workers employed in an executive, administrative or professional capacity are exempt from mandated meal and rest periods. (Cal. Code Regs., tit. 8, § 11040, subd. 1(A); *United Parcel Service Wage and Hour Cases* (2010) 190 Cal.App.4th 1001, 1010.)

Employees exempt from overtime pay include those employed in an administrative capacity, which "means any employee: [¶] (a) Whose duties and responsibilities involve either: [¶] (i) The performance of office or non-manual work directly related to management policies or general business operations of his/her employer or their employer's customers; . . . and [¶] (b) Who customarily and regularly exercises discretion and independent judgment; and [¶] (c) Who regularly and directly

---

[3] Accordingly, plaintiffs' claims for wrongful termination in violation of public policy also fail. (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 229.)

10

assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined for purposes of this section); or [¶] (d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or [¶] (e) Who executes under only general supervision special assignments and tasks; and [¶] (f) Who is primarily engaged in duties that meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201–205, 541.207–208, 541.210, and 541.215. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement. [¶] (g) Such employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment." (Cal. Code Regs. tit. 8, § 11070, subd. 1(A)(2).)

The Department of Labor has "promulgated interpretive regulatory guidelines explaining the terminology used in the regulatory definitions. One entire part, 29 Code of Federal Regulations part 541.201, is devoted to explaining the meaning of the phrase 'directly related to management policies or general business operations,' a phrase used in the administrative exemption provisions of IWC Wage Order No. 4-2001 (Cal. Code Regs., tit. 8, § 11040, subd. 1(A)(2)(a) . . . ). That regulation (29 C.F.R. § 541.201) is one of the federal regulations expressly incorporated into Wage Order No. 4-2001. (See Cal. Code Regs., tit. 8, § 11040, subd. 1(A)(2)(f).) It provides at the outset that '[t]o qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers.' (29 C.F.R. § 541.201(a) . . . .) It then

11

provides that '[t]he phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.' [Citation.]" (*Combs v. Skyriver Communications, Inc*. (2008) 159 Cal.App.4th 1242, 1255–1256 (*Combs*), italics omitted.)

"Subpart (b) of that federal regulation (29 C.F.R. § 541.201) gives additional interpretive guidance regarding the phrase 'directly related to the management or general business operations' by explaining that this phrase: [¶] '[I]ncludes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.' [Citation.]" (*Combs*, *supra*, 159 Cal.App.4th at pp. 1256–1257, italics omitted.)

Stukey's job title was "Bottling Manager." She was a salaried employee making $68,900 per year. She supervised three employees, including Mosley, who all reported directly to Stukey. Michael Scholz, the Vice President of Winemaking, was Stukey's supervisor from June 1, 2009 through the date of her termination. He described her duties as "supervision of bottling line employees and all bottling projects, helping me develop and monitor bottling schedules, . . . troubleshooting bottling line issues, ensuring the cost-effective purchasing and legal compliance of packaging materials, ensuring and/or coordinating labeling compliance, assisting Management with the internal TTB and compliance audit, warehousing and inventory management both at St. Supery and to a lesser degree at Western Wine Services."

At her deposition, Stukey testified she performed a wide variety of exempt duties, including overseeing the bottling department, "inventory preparation, execution, audit and reconciliation," developing and executing a budget, purchasing, obtaining temporary

workers, training, evaluating subordinate employees, conducting safety meetings and ensuring OSHA regulations were followed. She testified she was "in charge of the warehouse." Stukey testified she supervised Mosley, as well as a forklift operator named "Frankie" and temporary labor groups brought in during bottling. In 2009 and 2010, Stukey performed an internal audit for compliance and labeling. The project took about a month of her time, and involved going through "every label, ever[y] bottling that we ever did at St. Supery."

In addition to the work Stukey performed in the "functional areas" specified in Wage Order No. 4-2001, Stukey also testified as to various discretionary acts she performed. For example, she provided St. Supéry bottling "spec sheets" and pallet configuration documents to individuals outside the company because she believed she "had the discretion to make the decision." And, the nature of Stukey's duties as a supervisor necessarily required exercise of discretion and independent judgment.

At her deposition, Stukey could not recall what percentage of her time was spent on any of her duties, but she "thought about every single one of these things every day." After her deposition, Stukey corrected the transcript, adding the approximate percentage of her time she spent on various job duties.

Stukey maintains these modifications made to her deposition testimony show that "these broad job categories do not add up to spending a majority (50% or more) of her work time on exempt duties." Based on these deposition corrections, Stukey maintains she spent only 40 percent of her time performing the following duties: "productivity and cost [10 percent of her time] . . . developing and executing a budget [2 percent of her time], . . . building working relationship with peers [3 percent of her time], . . . purchasing [10 percent of her time], . . . maintaining knowledge of the work force [5 percent], and quality control [10 percent of her time]." Stukey also amended her deposition transcript in response to the question of what percentage of time she "monitor[ed] effectiveness of systems and [made] appropriate recommendations to ensure daily operations are efficient." She changed her response from "I couldn't tell

13

you" to "If I need to put percentages on these things, warehouse and inventory would be approximately 50%."

Stukey's changes to her deposition responses do not create a triable issue of fact regarding her exempt status. Her modified response that she spent 50 percent of her time on "warehouse and inventory" is not specific enough about those duties to demonstrate she was not performing exempt duties regarding warehouse and inventory. Indeed, the changed answer was in response to the question about what percentage of time she "monitor[ed] effectiveness of systems and [made] appropriate recommendations to ensure daily operations are efficient." Simply because those duties related to "warehouse and inventory" does not render them nonexempt.

The undisputed evidence demonstrated no triable issue of fact as to whether Stukey spent more than 50 percent of her time performing exempt duties. Thus, the court did not err in granting summary judgment regarding her claims for overtime, meal and rest breaks.

**Mosley's Meal and Rest Period Claims**

Mosley, a nonexempt employee, claims there is a triable issue of fact regarding whether she was unlawfully denied meal and rest periods.

"An employer's duty with respect to meal breaks . . . is an obligation to provide a meal period to its employees. The employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so. What will suffice may vary from industry to industry, and we cannot in the context of this class certification proceeding delineate the full range of approaches that in each instance might be sufficient to satisfy the law. [¶] On the other hand, the employer is not obligated to police meal breaks and ensure no work thereafter is performed. Bona fide relief from duty and the relinquishing of control satisfies the employer's obligations, and work by a relieved employee during a meal break does not thereby place the employer in violation of its obligations . . . ." (*Brinker Restaurant*

14

*Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1040–1041.) Additionally, "[e]mployers are . . . subject to a duty to make a good faith effort to authorize and permit rest breaks in the middle of each work period, but may deviate from that preferred course where practical considerations render it infeasible." (*Id.* at p. 1031.)

The undisputed evidence showed Mosley sometimes missed breaks, took them at the end of the work day, or took shortened meal breaks. However, the undisputed evidence also showed she either did so voluntarily, or it was infeasible to take breaks at a different time. Mosley testified as follows: "Q: So the instances in which you didn't take a break at all, you made the decision not to take the break, correct? A: Correct. Q: Did anybody at St. Supery ever force you to work through a break? A: No." If Mosley was "loading a truck or doing something like that . . . [she] would just—maybe just work past [her] break and then take [her] break afterwards." As to breaks near the end of a shift, Mosley testified "we were bottling and a lot of times we'd be getting close to finishing the tank around break time and it didn't make sense to stop right at break time." Mosley has failed to demonstrate any triable issue of fact regarding her meal and rest break claims.

**The Underpayment to Mosley for 0.16 hours of Overtime**

Mosley asserts she was entitled to "waiting time" penalties under Labor Code section 203 because the winery did not pay her the wages due for 0.16 hours of overtime not credited due to a time clock error.[4] She does not assert she was not paid, only that the $4.68 was paid after her termination.

Labor Code section 203 provides in part: "If an employer willfully fails to pay, without abatement or reduction, . . . any wages of an employee who is discharged or who

---

[4] The winery asserts the trial court erred in sustaining the objections to the testimony of Sheryl Johnson, the human resources manager, about her knowledge of the time clock operation. Because Johnson's understanding of the time clock functioning does not affect our conclusion that the 0.16-hour error was de minimus, we need not and do not reach that issue.

15

quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." (Lab. Code, § 203, subd. (a).)

The Ninth Circuit[5] has held, in regard to claims for overtime compensation under the Fair Labor Standards Act, "employees cannot recover for otherwise compensable time if it is de minimus." (*Lindow*, *supra*, 738 F.2d at p. 1062.) Although "[t]here is no precise amount of time that may be denied compensation as de minimus," *Lindow* set forth a number of factors to determine whether the time expended should be compensated, including "(1) the practical administrative difficulty of recording the time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." (*Id.* at pp. 1062–1063.) The court noted " '[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded.' " (*Id.* at p. 1062, citing *Anderson v. Mt. Clemens Pottery Co.* (1946) 328 U.S. 680, 692, superseded in part by statute on another ground as noted in *Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 31, fn. 6.) The amount of time at issue is a *total* of 0.16 hours. Mosley does not dispute that she was paid for that fraction of an hour, albeit apparently a few months after her termination. Under these circumstances, the de minimus rule applies and Mosley is not entitled to penalties under Labor Code section 203.

---

[5] Mosley asserts there is "no precedent for excusing late and/or 'de minimus' payment" of overdue compensation. California courts look to pertinent federal precedent in employment cases (*Horn*, *supra*, 72 Cal.App.4th at pp. 805–807) and federal cases have applied the de minimus rule in numerous employment contexts. (See *Lindow v. United States* (9th Cir. 1984) 738 F.2d 1057, 1062–1063 (*Lindow*) and cases cited therein.) At least one California case has discussed the de minimus rule, but held that between two and six hours per week overtime was not de minimus. (*Gomez v. Lincare, Inc.* (2009) 173 Cal.App.4th 508, 527.)

## DISPOSITION

The judgment is affirmed.  Defendants are awarded their costs on appeal.

_____
Banke, J.

We concur:

_____
Dondero, Acting P. J.

_____
Becton, J.*

---

\* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.